GENESCO, INC., Plaintiff-Appellee,
Cross-Appellant,

v.

T. KAKIUCHI & CO., LTD. T. Kakiuchi
America, Inc.; Peel Textiles, Ltd.; and
Frederick H. Schmeling, Defendants,

T. Kakiuchi & Co., Ltd. T. Kakiuchi
America, Inc., Defendants-Appellants,
Cross-Appellees.

Nos. 505, 632, Dockets 86–7698, 86–7728.

United States Court of Appeals,
Second Circuit.

Argued Dec. 11, 1986.

Decided April 1, 1987.

Robert D. Piliero, New York City (Lance Gotthoffer, Gary A. Adler, Ann G. Kayman, Marks Murase & White, New York, New York, of counsel), for defendants-appellants, cross-appellees T. Kakiuchi & Co., Ltd. and T. Kakiuchi America, Inc.

Michael F. Maschio, New York City (Joshua Paul, Cowan, Liebowitz & Latman, New York City, of counsel), for plaintiff-appellee, cross-appellant Genesco, Inc.

Before OAKES, CARDAMONE and DAVIS *, Circuit Judges.

CARDAMONE, Circuit Judge:

Plaintiff Genesco, Inc., (Genesco), a manufacturer of tailored clothing, brought this damage action in the United States District Court for the Southern District of New York (Lowe, J.), against two of its principal fabric suppliers, alleging essentially that they had conspired with one of its high-ranking employees to supply it with overpriced, damaged, and unsuitable goods. Defendants T. Kakiuchi & Co., Ltd. (Kakiuchi-Japan) and T. Kakiuchi America, Inc. (Kakiuchi-America), moved to stay the proceedings pending arbitration, which the district court denied except as to two claims against Kakiuchi-America. Both Kakiuchi defendants appeal the denial of their stay motions, and Genesco cross-appeals from the grant of the stay as to Kakiuchi-America's two claims.

## FACTS

Genesco is an American corporation engaged in the manufacture and distribution of tailored clothing throughout the United States. Kakiuchi-Japan, a Japanese corporation, exports fabric or "piece goods" to textile manufacturers and distributors. Kakiuchi-America, an American corporation wholly owned by Kakiuchi-Japan, is Kakiuchi-Japan's agent in the United States. Genesco obtains fabric for its manufacturing operations from Japan, Korea, and Great Britain, and began purchasing piece goods from Kakiuchis Japan and America, both of which have contacts in the textile business in those areas. These piece goods were purchased pursuant to a series of written orders and confirmation notices, together forming the parties' purchase and sales agreements. Each sales agreement contained an arbitration provision.

In 1979 the Kakiuchi defendants allegedly entered into a conspiracy with Genesco's vice-president of purchasing. In exchange for substantial payments, this official allegedly arranged to purchase all of Genesco's Japanese or English-origin piece goods solely from Kakiuchi-Japan or its affiliates. Genesco maintains that its employee also improperly approved the purchase of overpriced, damaged, unsuitable, or noncompetitive piece goods. Upon discovering this scheme, Genesco filed suit against Kakiuchis Japan and America[1] raising fraud, Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(a), (c), and (d) (1982), Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13(c) (1982), unjust enrichment, tortious interference with contractual relations, money had and received, and unfair competition claims. Kakiuchis Japan and America then moved pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–14 (1982)[2] and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, T.I.A.S. No. 6997, *reprinted at* 9 U.S.C.A. § 201 note (West Supp. 1986),[3] to stay the action pending arbitra-

---

* Honorable Oscar H. Davis, U.S. Circuit Judge for the Federal Circuit, Washington, D.C., sitting by designation.

1. Peel Textiles, Ltd., Genesco's English supplier of fabric, and Fredrick H. Schmeling, a former Genesco employee, were also named as defendants. The complaint has been dismissed as to Peel on *forum non conveniens* grounds, and the action as to Schmeling is proceeding in the district court. Thus, this appeal involves only defendants T. Kakiuchi & Co., Ltd. and T. Kakiuchi America, Inc.

2. Section 3 provides:
 If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.
 9 U.S.C. § 3 (1982).

3. Section 201 provides: "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter." 9 U.S.C. § 201 (1985). Article II of the Convention, in turn, provides:
 1. Each Contracting State shall recognize an agreement in writing under which the parties

tion. The district court judge referred the motions to a federal magistrate who issued his Report and Recommendation on March 5, 1986. On July 30, 1986, based on this recommendation, the district court granted Kakiuchi-America's motion to stay the fraud and RICO claims, denied its motion to stay the other claims, and denied Kakiuchi-Japan's motion *in toto*. On September 23, 1986, the district court certified the arbitration question for immediate appeal pursuant to 28 U.S.C. § 1292(b) (1982). We have jurisdiction over the legal claims on this appeal under 28 U.S.C. § 1292(a)(1), *see Paine, Webber, Jackson & Curtis, Inc. v. Chase Manhattan Bank*, 728 F.2d 577, 579 n. 2 (2d Cir.1984) and over the equitable claims under 28 U.S.C. § 1292(b).

## DISCUSSION

The United States Arbitration Act (the Act), codified at 9 U.S.C. §§ 1–14, reflects a legislative recognition of "the desirability of arbitration as an alternative to the complications of litigation." *Wilko v. Swan*, 346 U.S. 427, 431, 74 S.Ct. 182, 185, 98 L.Ed. 168 (1953). The Act, "reversing centuries of judicial hostility to arbitration agreements," *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974), was designed to allow parties to avoid "the costliness and delays of litigation," and to place arbitration agreements "upon the same footing as other contracts ..." H.R.Rep. No. 96, 68th Cong., 1st Sess. 1, 2 (1924); *see also* S.Rep. No. 536, 68th Cong., 1st Sess. (1924). To achieve these goals, it provides that written provisions to arbitrate controversies in any contract involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9

U.S.C. § 2. Section 2 is "a congressional declaration of a liberal federal policy favoring arbitration agreements...." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The Act also provides in § 3 for a stay of proceedings where the court is satisfied that the issue before it is arbitrable under the agreement, and § 4 of the Act directs a federal court to order parties to proceed to arbitration if there has been a " 'failure, neglect, or refusal' of any party to honor an agreement to arbitrate." *Scherk*, 417 U.S. at 511, 94 S.Ct. at 2453. These provisions are mandatory: "[b]y its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985) (original emphasis).

Given these statutory directives, a court asked to stay proceedings pending arbitration in a case covered by the Act has essentially four tasks: first, it must determine whether the parties agreed to arbitrate, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985); second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable, *see Mitsubishi*, 105 S.Ct. at 3355; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration. With these tasks

undertake to submit to arbitration all or any differences which may have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

21 U.S.T. at 2519; 9 U.S.C. § 201, Article II.

in mind, we consider first whether Genesco and the Kakiuchi defendants agreed to arbitrate their disputes.

## I *The Agreement to Arbitrate*

In each sales transaction Genesco submitted a written purchase order to Kakiuchi-Japan which then returned to Genesco a written sales confirmation form. On the back of the form is set forth a comprehensive list of terms and conditions. Among these terms and conditions, Clause 14 provides, in relevant part:

> All claims and disputes of whatever nature arising under this contract shall be settled amicably as far as possible, but in case of failing it shall be referred to [arbitration in Japan before the Japan Commercial Arbitration Association].

Genesco received these forms without objection, and returned a number of them to Kakiuchi-Japan with the initials or signature of a high-ranking officer. When it returned items Genesco also acknowledged the sales confirmation forms by referring to them in the return notices.

Genesco and Kakiuchi-America transacted business through a similar exchange of purchase orders and confirmation notes. On the bottom of the front side, Kakiuchi-America's sales confirmation note states: "THIS CONTRACT IS SUBJECT TO ALL THE TERMS AND CONDITIONS ON THIS AND THE REVERSE SIDE THEREOF, INCLUDING THE PROVISIONS OF PARAGRAPH 7 PROVIDING FOR ARBITRATION OF ALL DISPUTES." The arbitration clause on the reverse side states in relevant part:

> Any controversy arising out of or relating to this contract or any modification or extension thereof, including any claim for damages and/or rescission shall be settled by arbitration before a panel of three arbitrators in New York City.

Again Genesco received these forms without objection and returned a number of them with its signature.

Based on these exchanges and after a detailed review of the voluminous evidentiary submissions, the district court found that Genesco had agreed to arbitrate its disputes under both the signed and unsigned agreements with both the Kakiuchi defendants. We see no reason to disturb this factual finding. Fed.R.Civ.P. 52(a); *see In re Hart Ski Manufacturing Co.,* 711 F.2d 845, 846 (8th Cir.1983) (whether the parties have agreed to arbitrate is a factual question); *Hanes Supply Co. v. Valley Evaporating Co.,* 261 F.2d 29, 34–35 (5th Cir.1958) (same).

In enacting the federal Arbitration Act, Congress created national substantive law governing questions of the validity and the enforceability of arbitration agreements under its coverage. *See Mitsubishi,* 105 S.Ct. at 3354; *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. at 941; *Varley v. Tarrytown Associates, Inc.,* 477 F.2d 208, 209 (2d Cir.1973). Hence whether Genesco is bound by the arbitration clause of the sales confirmation forms is determined under federal law, which comprises generally accepted principles of contract law.[4] *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967); *In re Hart Ski Manufacturing,* 711 F.2d at 846; *Fisser v. International Bank,* 282 F.2d 231, 233 (2d Cir.1960); *Robert Lawrence Co. v. Devonshire Fabrics, Inc.,* 271 F.2d 402, 406 (2d Cir.1959), *cert. dismissed,* 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); *but see Supak & Sons Manufacturing Co. v. Pervel Indus., Inc.,* 593 F.2d 135, 137 (4th Cir. 1979).

Under general contract principles a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such an obligation. *See Coleman v.*

4. Applying Uniform Commercial Code § 2–207, Genesco's original purchase order form constituted an offer. Since Kakiuchi-Japan's confirmation form conditioned its acceptance to agreement of its terms, it was a counter-offer to which Genesco's signature constituted assent. *See generally C. Itoh & Co. (America) Inc. v. Jordan International Co.,* 552 F.2d 1228, 1234–37 (7th Cir.1977).

*Prudential Bache Securities, Inc.,* 802 F.2d 1350, 1352 (11th Cir.1986) (per curiam); *N & D Fashions, Inc. v. DHJ Industries, Inc.,* 548 F.2d 722, 727 (8th Cir. 1976). Here, the district court found that Genesco was an experienced textile concern with economic power equal to that of Kakiuchi-Japan. It also found no impediment to the validity of the agreement. On the contrary, the widespread use of arbitration clauses in the textile industry puts a contracting party, like Genesco, on notice that its agreement probably contains such a clause. *See N & D Fashions,* 548 F.2d at 726 & n. 8; *Avila Group, Inc. v. Norma J. of California,* 426 F.Supp. 537, 541 n. 10 (S.D.N.Y.1977). Thus, the district court properly concluded that Genesco was bound to arbitrate disputes arising under the signed sales confirmation forms. Genesco does not contest these findings, but claims instead that it never specifically agreed to the arbitration clauses. Such misapprehends our inquiry. We focus not on whether there was subjective agreement as to each clause in the contract, but on whether there was an objective agreement with respect to the entire contract. *See N & D Fashions,* 548 F.2d at 727.

■ As to the unsigned forms it is well-established that a party may be bound by an agreement to arbitrate even absent a signature. *See, e.g., McAllister Brothers, Inc. v. A & S Transportation Co.,* 621 F.2d 519, 524 (2d Cir.1980). Further, while the Act requires a writing, it does not require that the writing be signed by the parties. *See* 9 U.S.C. § 3; *Medical Development Corp. v. Industrial Molding Corp.,* 479 F.2d 345, 348 (10th Cir.1973); *Fisser,* 282 F.2d at 233. Thus, the district court did not err in finding that in this long standing and on-going relationship Genesco agreed to arbitrate disputes arising under the unsigned sales confirmation forms as well. *See Imptex International Corp. v. Lorprint Inc.,* 625 F.Supp. 1572 (S.D.N.Y. 1986). In short, Genesco agreed to arbitrate all disputes arising from purchase agreements with both Kakiuchis. We turn now to examine the scope of that agreement.

## II *The Scope of The Arbitration Agreement*

Relying on the magistrate's recommendations—which only discussed the arbitrability of the fraud and RICO claims—the district court found that none of the claims against Kakiuchi-Japan fall within its arbitration provision. As to Kakiuchi-America, it determined that only the common law fraud and RICO claims were within its arbitration clause. Hence, it concluded that Genesco's other claims against Kakiuchi-America were not subject to arbitration. We review these rulings *de novo.* *Mediterranean Enterprises, Inc. v. Ssangyong,* 708 F.2d 1458 1462–63 (9th Cir.1983); *see Lorber Industries of California v. Los Angeles Printworks Corp.,* 803 F.2d 523 (9th Cir.1986) (denial of motion to compel arbitration is subject to *de novo* review); *Zolezzi v. Dean Witter Reynolds, Inc.,* 789 F.2d 1447, 1449 (9th Cir.1986) (order compelling arbitration is subject to *de novo* review).

■ In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted. *See Mitsubishi,* 105 S.Ct. at 3352 n. 9, 3353 n. 13. If the allegations underlying the claims "touch matters" covered by the parties' sales agreements, then those claims must be arbitrated, whatever the legal labels attached to them. *See id.* at 3353 n. 13. Applying this test, the parties each paint a different picture of the controversy: Genesco maintains that conspiracy and bribery are at the heart of its complaint, while the Kakiuchi defendants claim that overcharges and defective goods—all relating to the contract—are the crux of Genesco's suit. An examination of the factual allegations in the complaint reveals that both are essentially correct.

Genesco brought eight separate common law and statutory claims for relief against Kakiuchi-Japan and seven against Kakiuchi-America, all based on the same central factual allegations. These allegations state that the defendants overcharged Gen-

esco over an extended period of time for the piece goods it had purchased from them under the purchase and sale agreements. Genesco claims that it later discovered that the prices paid were substantially above fair market value and that the piece goods were unsuitable, obsolete, out-of-season, or damaged. Defendants accomplished these overcharges and inappropriate sales, Genesco asserts, by conspiring with and bribing its vice-president for purchasing. Both conspiracy and damaged goods are asserted throughout the complaint, suggesting both tort and contract causes of action. This dual contractual and tortious nature of the action creates a difficult arbitrability question. Hence, we look to recent Supreme Court precedent for guidance.

Where, as here, a determination has been made that parties have entered into binding and enforceable agreements to arbitrate their disputes, the Supreme Court has made it evident that questions regarding the scope of the arbitration provision must be addressed:

> With a healthy regard for the federal policy favoring arbitration ... the Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Moses H. Cone,* 460 U.S. at 24–25, 103 S.Ct. at 941. This "emphatic federal policy in favor of arbitral dispute resolution" "applies with special force in the field of international commerce." *Mitsubishi,* 105 S.Ct. at 3356–57.

We expressed the same view in *S.A. Mineracao da Trindade-Samitri v. Utah Int'l, Inc. ("Samitri"):*

> The federal policy favoring arbitration requires us to construe arbitration clauses as broadly as possible. "[D]oubts as to arbitrability should be 'resolved in favor of coverage,' ... language excluding certain disputes from arbitration must be 'clear and unambiguous' or 'unmistakably clear' and ... arbitration should be

ordered 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"

745 F.2d 190, 194 (2d Cir.1984) (quoting *Wire Service Guild v. United Press Int'l,* 623 F.2d 257, 260 (2d Cir.1980) (quoting *International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. General Electric Co.,* 406 F.2d 1046, 1048 (2d Cir. 1969))). We now examine the specific claims for relief raised in the complaint more closely, mindful that doubts must be resolved in favor of arbitrability.

### A. The Statutory Claims

To determine the arbitrability of Genesco's statutory claims under RICO and Robinson-Patman, we must first decide whether these claims are included within the scope of the arbitration clauses and then whether these claims are arbitrable as a matter of law.

### 1. Scope of the Arbitration Clauses as to RICO

In Count III, Genesco alleges that defendants Kakiuchis Japan and America conspired with others to defraud and injure Genesco in its business through a pattern of racketeering activity in violation of the civil RICO statute, 18 U.S.C. § 1962(a), (c), and (d). Genesco asserts wire fraud, 18 U.S.C. § 1343, mail fraud, § 1341, and illegal interstate and foreign transportation as the predicate acts for this claim. More specifically, Count II states that the defendants caused to be delivered "confirmations, invoices and other documents relating to transactions necessary to defraud, or unlawfully obtain money and property, from Genesco" and caused to be sent in interstate and foreign commerce telexed messages, telephone calls, and wire transfers of funds from Genesco in furtherance of the conspiracy. The complaint also explains that the mailed invoices were fraudulent because they were "at prices substantially in excess of the fair market value" of the piece goods, for piece goods "unsuitable for use [by Genesco] in its tailored clothing operations", and for "obsolete, out-of-season, defective or damaged" piece

goods. Because the specific language of the two arbitration provisions differ, we consider the arbitrability of the claims against Kakiuchis Japan and America separately.

■ We find that the parties' arbitration clause encompasses Genesco's RICO claim against Kakiuchi-Japan. The wire, mail, and transportation fraud allegations which form the predicate acts of Genesco's RICO claim all derive from the parties' transactions under the sales agreements. Genesco's theory is, in essence, that Kakiuchi-Japan, through the improper use of the mails, telephone, and other modes of communication, fraudulently sold it piece goods which did not meet the standards and prices of the parties' sales agreements. Examining the complaint and bearing in mind that ambiguities in scope should be resolved in favor of coverage, *Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. at 941, particularly in the international context, *Mitsubishi*, 105 S.Ct. at 3357, we conclude that Genesco's RICO claim against Kakiuchi-Japan "arises under" the parties' sales agreements. Because Kakiuchi-America's arbitration clause is even broader than Kakiuchi-Japan's clause, Genesco's RICO claim against Kakiuchi-America *a fortiori* is one "arising out of" or "relating to" the parties' sales agreements.

### 2. *Arbitrability of RICO Claims*

Having determined that Genesco's civil RICO claims fall within the arbitration clauses, we must next decide as a matter of law whether Congress intended RICO claims to be nonarbitrable. This question has generated much controversy in recent years, resulting in both intercircuit, *compare, e.g., Mayaja, Inc. v. Bodkin,* 803 F.2d 157 (5th Cir.1986) (arbitrable), *petition for cert. filed,* 55 U.S.L.W. 3523 (Jan. 14, 1987) (No. 86–1160) *with, e.g., Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.,* 806 F.2d 291 (1st Cir.1986) (nonarbitrable), and intracircuit conflicts. *Compare, e.g., Rhoades v. Powell,* 644 F.Supp. 645 (E.D.Cal.1986) (nonarbitrable) *with Sacks v. Dean Witter Reynolds, Inc.,* 627 F.Supp. 377 (C.D.Cal.1985) (arbitrable)

*and compare also Preston v. Kruezer,* 641 F.Supp. 1163 (N.D.Ill.1986) (nonarbitrable) *with Steinberg v. Illinois Co. Inc.,* 635 F.Supp. 615 (N.D.Ill.1986) (arbitrable). The debate has come, in large part, in response to the Supreme Court's decision in *Mitsubishi,* which signaled a new approach to the arbitrability of statutory claims. Thus, *Mitsubishi* prompted many courts to rethink their stance on the arbitrability of RICO claims. For example, the Fifth Circuit at first held RICO claims to be nonarbitrable, *Smoky Greenhaw Cotton Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 785 F.2d 1274 (5th Cir.1986) (Greenhaw I), but then remanded the issue to the district court for full briefing on the ground that *Mitsubishi* cast doubt on its initial decision. *Id.* at 1282 (per curiam) (Greenhaw II). On later appeal, the Fifth Circuit affirmed the district court and held RICO claims to be arbitrable. *Smoky Greenhaw Cotton Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 805 F.2d 1221 (5th Cir.1986) (Greenhaw III); *see also Development Bank of the Philippines v. Chemtex Fibers Inc.,* 617 F.Supp. 55, 56–57 (S.D.N.Y.1985) (rethinking holding of district court in *Samitri* that RICO claims are nonarbitrable in light of *Mitsubishi* ).

In *Mitsubishi,* the Supreme Court held that nothing in the nature of the federal antitrust laws prohibits parties from agreeing to arbitrate antitrust claims arising out of international commercial transactions. 105 S.Ct. at 3355–61. In so holding, the Supreme Court stated that there is no *per se* presumption against arbitration of statutory claims. *Id.* at 3353. The Court warned against "disfavoring agreements to arbitrate statutory claims" and ignoring the "hospitable inquiry into arbitrability", and explained that the parties, having made the bargain to arbitrate, should be bound by it unless Congress itself has evinced an intention to preclude arbitration of the statutory rights at issue. *Id.* at 3355. Thus, rather than drawing presumptions regarding the arbitrability of statutory claims as courts have done in the past, *see, e.g., American Safety Equip. Corp. v. J.P. Maguire & Co.,* 391 F.2d 821 (2d Cir. 1968), *examined in Mitsubishi,* 105 S.Ct.

at 3355–61, we now must deduce from the text or legislative history of the federal statute in question evidence of an affirmative congressional protection of the right to a judicial forum. *Mitsubishi*, 105 S.Ct. at 3355. Absent that evidence, nothing prevents a court from concluding that Congress aimed to allow the arbitration of these claims.

Genesco argues that we have already held RICO claims to be nonarbitrable in both *McMahon v. Shearson/American Express, Inc.*, 788 F.2d 94 (2d Cir.), *cert. granted,* — U.S. ——, 107 S.Ct. 60, 93 L.Ed.2d 20 (1986) and *Samitri*, 745 F.2d 194. We cannot fully agree. *McMahon* held that RICO claims asserted in the context of *domestic* commercial transactions are nonarbitrable as a matter of law. 788 F.2d at 98–99. *McMahon* did not decide the arbitrability of RICO claims in the *international* context. In fact, *McMahon* explicitly distinguished the domestic case before it from the Supreme Court's teachings in the international arena. Thus, the *McMahon* court implicitly recognized *Mitsubishi*'s applicability to RICO claims arising in an international context. *See id.* Indeed, the Supreme Court has drawn a similar distinction between international and domestic contexts in the area of securities claims. *Compare Scherk*, 417 U.S. 506, 94 S.Ct. 2449 (international securities claim arbitrable) *with Wilko*, 346 U.S. 427, 74 S.Ct. 182 (domestic securities claim nonarbitrable). Thus, while *McMahon* does in fact govern any domestic RICO claims Genesco may have, it does not apply to international RICO claims.

Nor did we squarely address the arbitrability of international RICO claims in *Samitri*. In *Samitri*, the district court held that RICO Act claims were not arbitrable. 576 F.Supp. 566, 574 (S.D.N.Y.1983), *aff'd on other grounds*, 745 F.2d 190 (2d Cir. 1984). The district court analogized RICO claims to antitrust claims which, before *Mitsubishi*, courts had long held to be nonarbitrable. *See, e.g., Cobb v. Lewis*, 488 F.2d 41, 47 (5th Cir.1974); *Helfenbein v. International Indus., Inc.*, 438 F.2d 1068, 1070 (8th Cir.), *cert. denied*, 404 U.S. 872, 92 S.Ct. 63, 30 L.Ed.2d 115 (1971). Relying on the *American Safety* doctrine which states that the pervasive public interest in the enforcement of certain federal statutes makes claims arising under those statutes nonarbitrable, *see American Safety*, 391 F.2d at 827–28, the district court reasoned that, like antitrust laws, RICO Act enforcement not only affects the individuals involved, but also effectuates important societal policies, including the eradication of organized crime. 576 F.Supp. at 574–76. Because of this strong public interest, the district court concluded that RICO claims are nonarbitrable. *Id.* Because the parties did not challenge this portion of the district court's opinion on appeal, *see* 745 F.2d at 193, we had no opportunity to review the lower court's holding that international RICO claims are nonarbitrable under the *American Safety* doctrine. Therefore, though *Samitri* arose in an international context, we have yet to decide whether international RICO claims are arbitrable.[5]

■ To determine whether RICO is arbitrable in the international context we must evaluate RICO under the *Mitsubishi* analysis. In order for a statutory claim to override the strong federal policy in favor of arbitration, the party opposing arbitration must show that Congress reserved a federal forum to vindicate rights under that

---

5. Even were *Samitri* to be viewed as affirming the district court's opinion regarding the arbitrability of RICO claims, its continued viability would be called in to question after *Mitsubishi*. Our affirmance in *Samitri* was rendered during a time when the *American Safety* doctrine was of unquestioned authority. A year later *Mitsubishi* held antitrust claims to be arbitrable and rejected the *American Safety* doctrine's applicability to international arbitration agreements. 105 S.Ct. at 3355–61. Thus, to the extent that *Samitri* may be construed as implicitly affirming the district court's holding on the RICO claims, it must be reexamined in the wake of *Mitsubishi*. *See Baker v. Paine, Webber, Jackson & Curtis, Inc.*, 637 F.Supp. 419, 422 (D.N.J.1986) (questioning validity of the district court's decision in *Samitri* after *Mitsubishi*); *Steinberg*, 635 F.Supp. at 619 (same); *Brener v. Becker Paribas Inc.*, 628 F.Supp. 442, 450 (S.D.N.Y.1985) (same); *Development Bank of the Philippines v. Chemtex Fibers Inc.*, 617 F.Supp. 55, 56–57 (S.D.N.Y.1985) (same).

statute. *Mayaja,* 803 F.2d at 161; *see Mitsubishi,* 105 S.Ct. at 3355. In short, Genesco must demonstrate that Congress planned to make an exception to the Arbitration Act for RICO claims, *see Mitsubishi,* 105 S.Ct. at 3355, which must be deducible from either RICO's text or legislative history. *Id.* We examine each in turn.

RICO provides a private civil action to recover treble damages for injury caused by a violation of its substantive provisions. § 1964(c). It contains no anti-waiver provision prohibiting parties from voluntarily relinquishing a judicial forum. *Mayaja,* 803 F.2d at 164; *Jacobson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 797 F.2d 1197, 1202 (3rd Cir.), *petition for cert. filed,* 55 U.S.L.W. 3259 (Sept. 25, 1986) (No. 86–487); *cf. Wilko,* 346 U.S. at 437, 74 S.Ct. at 188 (anti-waiver provision reveals congressional intent to bar arbitrability of securities actions under the Securities Act of 1933). Nothing in the statutory language suggests that RICO claims are to be excluded from the dictates of the Act. We turn then to the legislative history.

Added to the House version of the bill after the original bill had been passed by the Senate, the private treble-damages provision of RICO, codified as § 1964(c), received relatively little discussion in either House. *Mayaja,* 803 F.2d at 164; *see Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 3280, 87 L.Ed.2d 346 (1985). Nor did the legislative debate address the arbitrability of claims brought under § 1964(c). *Accord Mayaja,* 803 F.2d at 164; *Jacobson,* 797 F.2d at 1202 ("[T]here is no legislative history suggesting that Congress ever considered whether RICO civil claims should be arbitrated.").

Because Congress failed to comment on arbitrability, we examine the purposes underlying § 1964(c) to determine whether—due to an inherent conflict between those purposes and the arbitration of such claims—Congress implicitly intended RICO claims to be nonarbitrable. *See Mitsubishi,* 105 S.Ct. at 3355, 3358–60 (examining, in the absence of an explicit statement of congressional intent as to arbitrability, congressional policies behind § 4 of the Clayton Act); *cf. McDonald v. City of West Branch,* 466 U.S. 284, 290, 104 S.Ct. 1799, 1803, 80 L.Ed.2d 302 (1984) (holding that § 1983 claims are nonarbitrable because arbitration "cannot provide an adequate substitute for a judicial proceeding" in achieving § 1983's objectives); *Barrentine v. Arkansas-Best Freight Sys.,* 450 U.S. 728, 742–45, 101 S.Ct. 1437, 1445–47, 67 L.Ed.2d 641 (1981) (finding congressional intent that Fair Labor Standards Act of 1938 claims be nonarbitrable because of conflict between arbitration and FLSA's purposes); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 56, 94 S.Ct. 1011, 1023, 39 L.Ed.2d 147 (1974) ("The purpose and procedures of Title VII indicate that Congress intended federal courts to exercise final responsibility for enforcement of Title VII; deferral to arbitral decisions would be inconsistent with that goal.").

The legislative history of § 1964(c) reveals three recurrent congressional purposes: First, Congress' primary purpose in enacting § 1964(c) was to compensate the victims of organized crime. Representative Steiger, who proposed the addition of a private treble-damages action, emphasized that "those who have been wronged by organized crime should at least be given access to a legal remedy." *Sedima,* 105 S.Ct. at 3280 (quoting *Hearings on S. 30, and Related Proposals, before Subcommittee No. 5 of the House Committee on the Judiciary,* 91st Cong., 2d Sess., 520 (1970) (hereinafter cited as House Hearings)). During the congressional debates on § 1964(c), Congressman Steiger made his point even more forcefully: "[i]t is the intent of this body, I am certain, to see that innocent parties who are the victims of organized crime have a right to obtain proper redress.... It represents the one opportunity for those of us who have been seriously affected by organized crime activity to recover." *Mayaja,* 803 F.2d at 165 (quoting 116 Cong.Rec. 35,346–47 (1970)); *see also Sedima,* 105 S.Ct. at 3286 (Congress expressly admonished that RICO is to "be liberally construed to effectuate its *remedial* purposes" which are nowhere more evident than in § 1964(c) (quoting RICO, Pub.L. 91–452, § 904(a), 84 Stat.

947) (emphasis added)). The provision's secondary purpose was to deter organized crime: "[i]n addition, the availability of such a remedy would enhance the effectiveness of title IX's [i.e., RICO's] prohibitions." *Mayaja*, 803 F.2d at 164 (quoting *House Hearings, supra,* at 520). Thus, § 1964(c) is primarily a compensatory and secondarily a deterrent measure. The House passed the bill as proposed, 116 Cong.Rec. at 35,363–64; *Sedima*, 105 S.Ct. at 3281, and the Senate adopted the bill as amended in the House. 116 Cong.Rec. at 36,296; *Sedima*, 105 S.Ct. at 3281.

The third important congressional theme was to model § 1964(c) after § 4 of the Clayton Act. In fact, the RICO treble-damages language of § 1964(c) tracks virtually word for word the similar provision of § 4 of the Clayton Act, 15 U.S.C. § 15. As the Supreme Court observed: "[t]he clearest current in [RICO's] history is the reliance on the Clayton Act model, under which private and governmental actions are entirely distinct." *Sedima*, 105 S.Ct. at 3282; *Mayaja*, 803 F.2d at 165 ("[S]ection 4 of the Clayton Act ... [was] recurrently invoked during the congressional discussion of RICO's private treble damages provision.").

Given *Mitsubishi*'s analysis, Congress' reliance on § 4 of the Clayton Act is particularly relevant to the arbitrability question before us. In *Mitsubishi*, the Supreme Court examined the legislative purposes behind § 4 in order to determine the arbitrability of antitrust claims brought under that section. 105 S.Ct. at 3358–60. Undertaking the same analysis we undertake today, the Court found that "[n]otwithstanding its important incidental policing function, the treble-damages cause of action ... seeks primarily to enable an injured competitor to gain compensation for that injury." *Id.* at 3359. Emphasizing the priority of compensatory function of § 4 over its deterrent function, the Court found no congressional intent to preclude arbitration of antitrust claims. *Id.* (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)).

■ Genesco raises two objections to arbitrability, contending that RICO's complexity warrants its nonarbitrability and that public interest in the enforcement of RICO precludes its arbitration. Neither argument has merit. Complexity, of course, is not a reason to deny arbitrability. *See Mitsubishi*, 105 S.Ct. at 3355, 3357–58. In addition, after *Mitsubishi*, "determining statutory claims to be nonarbitrable on the basis of some judicially recognized public policy rather than as a matter of statutory interpretation is no longer permissible." *Jacobson*, 797 F.2d at 1202.

Moreover, private civil RICO actions have come to implicate primarily private interests, thus obviating public policy concerns supporting an exclusively judicial forum. As the Supreme Court recognized in *Sedima*, RICO in its private civil version has evolved into a federal business tort statute. 105 S.Ct. at 3287. In fact, civil RICO claims are almost always asserted against respected and legitimate enterprises, "rather than against the archetypal, intimidating mobster." *Id.; see also Report of the Ad Hoc Civil RICO Task Force,* 1985 A.B.A. Sec. of Corp., Banking & Bus.Law 55 (1985) (77% of all civil RICO cases involve securities, wire, or mail fraud in a commercial or business setting); Abrams, *The Civil RICO Controversy Reaches the Supreme Court,* 13 Hofstra L.Rev. 147, 153 n. 31 (1985) (same).

■ Paralleling *Mitsubishi*'s analysis, we find no congressional barriers to the arbitration of international RICO claims. Since plaintiffs, like Genesco, may effectively vindicate their RICO causes of action in the arbitral forum, the statute will continue to serve both its primary remedial and secondary deterrent functions. *See Mitsubishi*, 105 S.Ct. at 3359–60. Thus, the arbitration of these claims is not inconsistent with the congressional purposes underlying RICO's enactment. In sum, nothing in RICO's text or legislative history evidences a congressional exception to the federal Arbitration Act for RICO violations. Accordingly, we hold as a matter of law that RICO claims arising in an international context are arbitrable. *See Suthira-*

*chartkul v. Shearson Lehman Brothers Inc.*, 806 F.2d 37 (2d Cir.1986) (per curiam) (remanding to the district court to consider the applicability of *Scherk* to an allegedly "international" RICO claim); *Jacobson*, 797 F.2d at 1202–03 (holding RICO claims based on mail and wire fraud to be arbitrable in the absence of a contrary congressional intent); *Chemtex Fibers*, 617 F.Supp. at 57 (holding international RICO claims arbitrable). Having so held, we must now apply this rule to Genesco's RICO claims against Kakiuchis Japan and America.

### a) *Kakiuchi-Japan*

The arbitration agreement between Genesco and Kakiuchi-Japan clearly arises in the international context and therefore the mandate of *Mitsubishi* applies with full force. First, the agreements involve "truly international" business transactions. *See Samitri*, 745 F.2d at 195. Kakiuchi-Japan, a Japanese corporation, and Genesco, an American corporation, entered into agreements to purchase piece goods from Japan and other foreign sources. These agreements call for arbitration of disputes in Japan. Here, as in *Samitri*, "the corporations are of diverse nationality", and the products that are the subject matter of the agreements are produced in one country and sold in another. *Id., see also Mitsubishi*, 105 S.Ct. at 3349 (where international context permitting arbitration of a statutory claim consisted of parties of diverse nationality, performance of contractual obligations outside the U.S., and a contract providing for arbitration in Japan); *Scherk*, 417 U.S. at 508, 94 S.Ct. at 2451 (where international context requiring arbitration of a statutory claim included parties of diverse nationality, sale of a foreign business, and a contract providing for arbitration in France). Under these circumstances, the concerns voiced by the Supreme Court in *Mitsubishi*—international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes—are equally compelling with respect to Genesco's transactions with Kak-

iuchi-Japan and accordingly require us to enforce the parties' agreement to arbitrate this claim. *See* 105 S.Ct. at 3355; *see also id.* at 3356–57 (discussing the international concerns voiced in *Scherk* and *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). In fact, courts holding RICO claims to be nonarbitrable since *Mitsubishi*, have done so exclusively in the domestic context. *See, e.g., Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F.2d 291, 298–300 (1st Cir.1986); *Tashea v. Bache, Halsey, Stuart, Shields, Inc.*, 802 F.2d 1337 (11th Cir.1986); *McMahon*, 788 F.2d at 98–99.

■ The Supreme Court has stated that if international arbitral institutions are to take a central place in the international legal order as Congress envisioned, "it will be necessary for national courts to subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration." *Mitsubishi*, 105 S.Ct. at 3360. We take that step today and hold that Genesco's RICO claim against Kakiuchi-Japan must be resolved through arbitration.

### b) *Kakiuchi-America*

The district court held that Genesco's RICO claim against Kakiuchi-America is arbitrable. Adopting the magistrate's report, it found that the transactions between Genesco and Kakiuchi-America were international in character:

[A]lthough Kakiuchi-America is a United States-based corporation, the transactions at issue are plainly international in character. Apparently all of the purchases identified by Kakiuchi[-America] were of piece goods shipped from overseas and unloaded, pursuant to the terms of the sales notes, at the Port of New York. Since the transactions themselves were directly in the stream of international commerce, the policy considerations suggested in *Mitsubishi* as compelling arbitration appear generally applicable here as well even though the arbitration itself is to be conducted in New York.

We cannot agree. Although the subject goods were in fact produced in one country and sold in another, this alone is insufficient to trigger the international concerns voiced in *Mitsubishi*, which stated that an international context raises the added concerns of international comity, respect for foreign tribunals, and international commercial predicability that would require the arbitration of a case which may not be arbitrable in a domestic context. *Id.* at 3355. Genesco's transactions with Kakiuchi-America do not implicate these concerns. Because arbitration is called for in New York, our refusal to compel arbitration in this instance would not demonstrate disrespect for foreign arbitral institutions, nor adversely affect international comity. Moreover, because Genesco and Kakiuchi-America are both American corporations, litigation of their RICO dispute would not disrupt *international* commercial predictability. In short, Genesco's agreement with Kakiuchi-America does not arise in a "truly international" commercial context. *Cf. Mitsubishi*, 105 S.Ct. at 3349 (international factors include parties of diverse nationality and arbitration in Japan); *Scherk*, 417 U.S. at 508, 94 S.Ct. at 2451 (international factors include parties of diverse nationality and arbitration in France); *Samitri*, 745 F.2d at 195 (international factors include parties of diverse nationality, arbitration in France, and the application of foreign law).

Consequently, under *McMahon*, Genesco's domestic RICO claim against Kakiuchi-America would not be subject to arbitration. 788 F.2d at 98. Since such precedent, of course, governs this panel, we would ordinarily simply hold that this domestic RICO claim is not arbitrable and remand the claim for trial. But, because the Supreme Court granted *certiorari* in *McMahon, see Shearson/American Express, Inc. v. McMahon,* — U.S. —, 107 S.Ct. 60, 93 L.Ed.2d 20 (1986), *granting cert.* to 788 F.2d 94 (2d Cir.), and heard oral argument in that case on March 3, 1987, a decision should soon be forthcoming. In light of that prospect, to require a trial to go forward appears, under these particular circumstances, a waste of judicial and legal resources. Consequently, we remand the claim to the district court with the suggestion that it not go forward with trial until the Supreme Court renders its decision in *McMahon. Cf. Sutchirachartkul v. Shearson/Lehman Bros., Inc.,* 806 F.2d 37, 39 (2d Cir.1986).

### 3. *Robinson-Patman*

 Count III of Genesco's complaint simply restates the facts and asserts that "the aforesaid actions" "constitute unfair trade practices in violation of section 2(c) of the Robinson-Patman Act." Section 2(c) makes it "unlawful for any person engaged in commerce ... to pay or grant, receive or accept anything of value as a commission, brokerage, or other compensation ... except for services rendered in connection with the sale or purchase of goods...." 15 U.S.C. § 13(c) (1982). As already observed, § 4 of the Clayton Act, under which Genesco's Robinson-Patman claims are brought, provides for an express private right of action for treble damages to any person injured in his business or property as a result of any antitrust violation. 15 U.S.C. § 15 (1982). Upon examining § 4, the Supreme Court found no congressional purpose to preclude arbitration of international antitrust claims. *Mitsubishi*, 105 S.Ct. at 3355-61. Thus, we hold under *Mitsubishi* that the international Robinson-Patman claims are arbitrable as a matter of law. We now consider the claims at hand.

#### a) *Kakiuchi-Japan*

 First, Genesco's Robinson-Patman claim against Kakiuchi-Japan is within the scope of the parties' arbitration provision. That claim is based on "the imposition of overcharges", which we have already found to "arise under" the parties' sales agreements. Second, as noted, the transactions between Genesco and Kakiuchi-Japan arose in a "truly international" context. Thus, the dictates of *Mitsubishi* apply. Consequently, Genesco's Robinson-Patman claim against Kakiuchi-Japan must similarly be resolved through arbitration.

### b) *Kakiuchi-America*

For the same reasons, Genesco's Robinson-Patman claim against Kakiuchi-America is within the scope of the arbitration clause. But since Genesco's dealings with Kakiuchi-America do not arise in an international context, the teachings of *Mitsubishi* are not binding. *See* 105 S.Ct. at 3355 (declining to assess the legitimacy of the *American Safety* doctrine as applied to domestic transactions involving arbitration). Inasmuch as the Supreme Court will decide the continued applicability of the *American Safety* doctrine to domestic commercial transactions in its review of *McMahon, see* — U.S. —, 107 S.Ct. 60, 93 L.Ed.2d 20 (1986), this cause of action is also remanded to the district court again with the suggestion that it not go forward with trial until the Supreme Court renders its decision in *McMahon.*

### B. *The Common Law Claims*

#### 1. *Fraud*

In Count I, Genesco asserts a common law fraud claim against Kakiuchis Japan and America based on transactions involving Japanese piece goods. In Count IV, Genesco asserts a similar claim against Kakiuchi-Japan involving British merchandise. Specifically, Genesco alleges that the Kakiuchi defendants through a pattern of bribery, fraudulently induced it to enter into a series of sales transactions involving overpriced, defective, or otherwise inappropriate goods. These counts also rely on a reassertion of the facts and, in particular, on the description of the fraudulent invoices. Thus, in effect, this portion of the plaintiff's case rests on a claim of fraudulent inducement.

We note at the outset that fraudulent inducement claims have long been held to be arbitrable as a matter of law. *See, e.g., Prima Paint Corp.,* 388 U.S. at 402–07, 87 S.Ct. at 1805–07, *Samitri,* 745 F.2d at 195; *Robert Lawrence Co.,* 271 F.2d at 411. Therefore, we need only address whether the present claims fall within the specific arbitration clauses at issue. Since the language of these two clauses differ, we examine the fraud claims against Kakiuchis Japan and America separately.

#### a) *Kakiuchi-Japan*

Relying on our decision in *In re Kinoshita & Co.,* 287 F.2d 951 (2d Cir.1961), the district court held that Genesco's fraud claims against Kakiuchi-Japan fall outside the scope of the arbitration agreement. Although that court recognized that *Kinoshita* was later limited to "its precise facts" by *Samitri,* 745 F.2d at 194, it nevertheless found that the specific wording of the instant clause was the "equivalent" of the *Kinoshita* clause which was held to be too narrow to encompass a fraudulent inducement claim. *See* 287 F.2d at 953. We disagree.

The "narrow" provision involved in *Kinoshita* required arbitration of "any dispute or difference aris[ing] under" the agreement. *Id.* at 952. The "broad" *Samitri* clause provided for arbitration of "any question or dispute aris[ing] or occur[ring] under" the agreement. 745 F.2d at 192. Based on this difference in language, the *Samitri* court distinguished the clause before it from the *Kinoshita* clause and held that unlike the *Kinoshita* clause, it was sufficiently broad in scope to cover the fraudulent inducement claim. *Id.* at 194–95. The instant clause is equally distinguishable from the *Kinoshita* clause. The clause here requires arbitration of "all claims and disputes *of whatever nature* arising under this contract." (emphasis added). The phrase "of whatever nature" indicates the parties' intent to submit all claims and disputes arising under the contract to arbitration, whether they be tortious or contractual in nature. Moreover, as already emphasized, any ambiguity surrounding the clause's language *"should* be resolved in favor of arbitrability." *Moses H. Cone,* 460 U.S. at 24–25, 103 S.Ct. at 941. Thus, we conclude that the arbitration clause is sufficiently broad to encompass Genesco's fraud claims against Kakiuchi-Japan.[6]

---

6. We are invited to overrule *Kinoshita.* While we recognize, as did *Samitri,* that *Kinoshita* is

### b) *Kakiuchi-America*

The district court concluded that the language of the Genesco/Kakiuchi-America arbitration clause—"[a]ny controversy arising out of or relating to this contract"—is sufficiently broad to require arbitration of Genesco's fraudulent inducement claim against Kakiuchi-America. We agree. *Kinoshita* itself recognized that the inclusion of the phrase "relating to" in an arbitration provision requires a fraudulent inducement claim to be resolved by the arbitrators and not the courts. 287 F.2d at 953; *see Samitri*, 745 F.2d at 194; *see also Prima Paint*, 388 U.S. at 406, 87 S.Ct. at 1807 ("[a]ny controversy or claim arising out of or relating to this agreement" is easily broad enough to encompass fraudulent inducement claim). The arbitration clause therefore covers Genesco's fraud claim against Kakiuchi-America.

### 2. *Unfair Competition*

In Count X Genesco asserts an unfair competition claim against the Kakiuchi defendants based on a reallegation of its fraud counts. Genesco's theory is, in essence, that the defendants conspired with one of its employees to destroy its business through the systematic acceptance of overcharges and unmarketable goods. Specifically, Genesco was allegedly tricked into purchasing defendants' piece goods in damaged condition at prices substantially in excess of their fair market value.

We addressed the arbitrability of an almost identical claim in *Altshul Stern & Co., Inc. v. Mitsui Bussan Kaisha, Ltd.*, 385 F.2d 158 (2d Cir.1967). There, Altshul Stern, a garment wholesaler, charged its Japanese manufacturer with conspiring with its employee to destroy its business. *Id.* at 158. Although alleging a conspiracy claim rather than an unfair competition claim, Altshul Stern asserted, like Genesco, that the defendant-manufacturer made overcharges, failed to deliver ordered

goods, and shipped defective goods. *Id.* at 159. Viewing these allegations, we observed that plaintiff's claim was not "wholly independent of the contract", and that it could not "avoid the broad language of the arbitration clause by the casting of its complaint in tort." *Id.* As a result, we held that Altshul Stern's claim was subject to arbitration. *Id.* The reasoning of *Altshul Stern* applies equally to Genesco's unfair competition claims. Genesco cannot escape arbitration of its contractually-related claims simply by labeling them "unfair competition." As the Supreme Court recently observed, "[t]he preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered," a concern which "requires that [courts] rigorously enforce agreements to arbitrate." *Byrd*, 470 U.S. at 221, 105 S.Ct. at 1242. Hence, the unfair competition claims against the Kakiuchi defendants must be arbitrated. *See Necchi Sewing Machine Sales Corp. v. Necchi, S.p.A.*, 369 F.2d 579 (2d Cir.1966) (holding unfair competition claim arbitrable); *JAB Industries, Inc. v. Silex S.P.A.*, 601 F.Supp. 971 (S.D.N.Y.1985) (same).

### 3. *Unjust Enrichment/Money Had and Received*

Counts V and VIII set forth claims for relief under theories of unjust enrichment and money had and received respectively. These claims are also based on a reallegation of the central facts and focus primarily on the alleged overcharges. These claims, of all of those before us, relate most directly to the sales agreements between Genesco and Kakiuchis Japan and America. In fact, the only "money" that the two Kakiuchis could have improperly "had and received" is the excess value allegedly charged Genesco for their piece goods. At oral argument, counsel for Genesco conceded that the money had and received claim related directly to the alleged overcharges. Since this claim will

---

inconsistent with the federal policy favoring arbitration, *see* 745 F.2d at 194, nevertheless, we decline the invitation. Because the instant clause is distinguishable from the *Kinoshita* clause, we need not discuss the continued viabil-

ity of *Kinoshita*. *See Scherk*, 417 U.S. at 508, 94 S.Ct. at 2451 (clause requiring arbitration of "any controversy or claim ... aris[ing] out of this agreement" held to cover fraudulent misrepresentations claim).

rest *inter alia* on a comparison of the contract price and the actual price paid, it necessarily involves an interpretation of the parties' contracts and dealings, a subject well suited for arbitration.

■ Similarly, defendants' alleged "unjust enrichment" could only be a result of overcharging Genesco. Because this claim is predicated on the defendants' contractual duty to bill Genesco accurately for the specific goods ordered, it too "arises under" the textile sales contracts. *Janmort Leasing, Inc. v. Econo-Car International, Inc.,* 475 F.Supp. 1282, 1292 (E.D.N.Y.1979). Since the sales agreements lie at the heart of both the unjust enrichment and money had and received claims, they must also be resolved through arbitration.

### 4. *Tortious Interference with Contractual Relations*

■ In Count VII Genesco alleges that Kakiuchis Japan and America tortiously interfered with its contractual relationship with an executive officer of its purchasing division through repeated acts of commercial bribery. Clearly, Kakiuchis Japan and America's alleged interference with Genesco's employment contract with one of its officers does not "arise under" or "relate to" Genesco's sales agreements with the defendants. In *Altshul Stern,* 385 F.2d at 159, we stated that the plaintiff-wholesaler's allegation that the defendant-manufacturer induced plaintiff's employee to violate his employment agreement was "on its face unrelated" to the textile sales contracts between the parties. Therefore, we denied arbitration of that claim. *Id.* Following that logic, Genesco's tortious interference with contractual relations claim is not subject to arbitration. See *Ssangyong,* 708 F.2d at 1464 (count alleging a conspiracy to induce breach of a separate third-party contract was not subject to arbitration).

### III *A Stay of the Proceedings*

■ Having found Counts I, IV, V, VIII and X arbitrable as to both defendants and Counts II and III arbitrable as to Kakiuchi-Japan, we must now decide whether to stay the remaining claims pending arbitration. The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket. *See Moses H. Cone,* 460 U.S. at 20 n. 23, 103 S.Ct. at 939 n. 23. Broad stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit. *See, e.g., NPS Communications, Inc. v. Continental Group, Inc.,* 760 F.2d 463, 465 (2d Cir.1985); *Samitri,* 745 at 196–97.

Here the district court declined to stay the proceedings because it found that only two of Genesco's claims were arbitrable. This ruling should be re-evaluated by the district court in light of our opinion for it to determine on balance whether there should be a stay. *See Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

## CONCLUSION

To summarize, we affirm the holding of nonarbitrability of the tortious interference with contractual relations claims but remand the claim to the district court to consider whether it should be stayed pending arbitration. Genesco's unjust enrichment, money had and received, and unfair competition claims against both Kakiuchis Japan and America are within the scope of the parties' arbitration provisions. Accordingly, we reverse the district court's denial of a stay as to those claims. We also reverse the district court's denial of a stay as to Genesco's fraud, RICO, and Robinson-Patman claims against Kakiuchi-Japan.

Finally, we remand Genesco's RICO and Robinson-Patman claims against Kakiuchi-America to the district court for further proceedings in light of the Supreme Court's forthcoming decision in *Shearson/American Express v. McMahon,* —— U.S. ——, 107 S.Ct. 60, 93 L.Ed.2d 20 (1986).

Affirmed in part; reversed and remanded in part.