DAVID L. THRELKELD & CO., INC.,
Plaintiff–Appellee,

v.

METALLGESELLSCHAFT LIMITED (LONDON), and Peter Montrose, and Terry Willsone, Defendants,

METALLGESELLSCHAFT LIMITED (LONDON), Defendant–Counterclaimant–Appellant,

v.

DAVID L. THRELKELD & CO., INC., Counterclaim–Defendant–Appellee.

No. 359, Docket 90–7480.

United States Court of Appeals,
Second Circuit.

Argued Nov. 7, 1990.

Decided Jan. 15, 1991.

John M. Quitmeyer (Rogers & Wells, New York City, Nancy A. Brown and Nancy L. Hahn, on the brief), for defendant-counterclaimant-appellant.

Robert B. Hemley (Gravel and Shea, Burlington, Vt., Norman Williams and Dennis R. Pearson, on the brief), for plaintiff-appellee.

Before LUMBARD, KEARSE and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Plaintiff-appellee, David L. Threlkeld & Co., Inc. ("Threlkeld"), sues for damages allegedly incurred as a result of a breach of contract and negligent performance of the contract by defendant-appellant, Metallgesellschaft, Ltd. (London) ("MG").

Threlkeld sued MG, Peter Montrose, and Terry Willsone in the Vermont Superior Court.[1] Threlkeld's complaint is that defendants negligently misvalued plaintiff's copper and aluminum forward positions and that MG breached an alleged oral agreement to provide plaintiff with accurate valuations of these copper and aluminum positions. MG subsequently removed the action to the United States District Court for the District of Vermont on the basis of diversity of citizenship. 28 U.S.C. § 1441(a) (1988). MG moved to dismiss for lack of subject matter jurisdiction, or, in the alternative, to stay the action and to compel arbitration of Threlkeld's claims. Judge Coffrin converted the motion into one for summary judgment, and then denied it in all respects. MG appeals this denial. We have jurisdiction over this interlocutory appeal pursuant to 9 U.S.C. § 15 (1988). For the reasons stated below, we reverse.

## BACKGROUND

Threlkeld, a closely-held Vermont corporation with its principal place of business in Randolph, Vermont, engages in trading forward contracts for metals. To purchase and sell forward contracts on the London Metal Exchange ("LME"), a licensed "ring-dealing" member must perform the transaction. MG—a London based limited-liability company incorporated under the laws of the United Kingdom—is a "ring-dealing" member of the LME.

Forward contracts are promises to buy or to sell a particular commodity on a specified date at a predetermined price. This type of trading is inherently speculative, and sophisticated commodities traders such as Threlkeld profit from well-calculated purchases and sales.

MG, as a licensed "ring-dealing" member, acts as the principal in transactions it enters into for its clients. It is paid a fee for its services and may require a client to post security for any eventual loss should the value of the forward contract decrease before the scheduled delivery date. The amount of security required to be maintained in a client's margin account fluctu-

---

1. Peter Montrose and Terry Willsone are former employees of DLT Commodities, Ltd., an affiliate of Threlkeld. Neither of these parties has appeared in the action.

ates because it is tied to the daily valuation of the particular commodity. Should it appear to MG that a particular commodity has been inaccurately valued and MG, as the principal, is faced with an impending loss, it will make a margin call; and the client involved will then be required to insulate MG from the projected loss.

In June, 1986, Threlkeld and MG entered into an informal agreement for MG to purchase and sell Threlkeld's forward contracts for metals on the LME. Several months later, the parties decided to formalize their relationship by reducing their agreement to writing. A preliminary agreement—the "Memo to File"—was signed by the parties on February 3, 1987. This document contemplated a still more formalized agreement at some point in the future. Among other things, the preliminary agreement stated: "The final agreement will be subject to arbitration and subject to the laws of England." The parties subsequently agreed that because of the good will between them, there was no need for a formalized agreement.

While their relationship was smooth, MG entered into numerous forward contracts for copper and aluminum on behalf of Threlkeld. Many of these contracts were memorialized in written confirmations sent by MG to Threlkeld and subsequently signed by Threlkeld. The confirmations specifically stated that the contracts were "subject to the current rules and regulations of the London Metal Exchange." Another document—the "Terms of Business" —was MG's standard-form customer contract, which Threlkeld executed on September 14, 1988. The Terms of Business also made the rules and regulations of the LME applicable to the parties' business relationship. The rules and regulations of the LME are, therefore, crucial to this controversy.

The LME Rules contain two arbitration provisions. The first states: "[A]ny dispute ... arising out of any Contract shall be referred to arbitration in accordance with the Rules." LME Rules, Part 4 ("Contract Regulations"), Rule 10.1. The second LME arbitration provision states:

"All disputes arising out of or in relation to any contract which contains an agreement to refer disputes to arbitration in accordance with the Rules and Regulations of the London Metal Exchange ... shall be referred to arbitration as hereinafter provided." LME Rules, Part 8 ("Arbitration Rules"), Rule 1.1.

Threlkeld does not contest the general applicability of the LME Rules. Rather, Threlkeld maintains that, properly construed, neither the agreements between the parties (i.e., the Memo to File and the Terms of Business) nor the LME Rules call for arbitration of the present claims. Threlkeld asserts that its damages stem from a collateral agreement, wholly separate and distinct from the forward contracts entered into by MG on Threlkeld's behalf, and that this collateral agreement does not contain an arbitration provision.

The collateral agreement was allegedly reached in 1989, when Threlkeld found itself unable to evaluate its own financial position in its outstanding forward contracts. In need of accurate valuation services, Threlkeld turned to MG for help. Threlkeld alleges that MG agreed to provide Threlkeld with accurate ledger balances, forward contract valuations, and margin requirements on a daily basis. The complaint asserts that MG repeatedly assured Threlkeld that the required valuations would be accurate and that Threlkeld could safely continue to trade in reliance on MG's valuations.

In early August, 1989, MG, while evaluating the financial situation, realized that Threlkeld's copper contracts had been substantially overvalued. On August 2, 1989, MG projected a loss on these copper positions of approximately five million dollars and issued a margin call to Threlkeld of 1.7 million dollars.

Alarmed by the chaos in its copper positions, Threlkeld commissioned its own internal investigation of its aluminum positions, only to conclude that MG had systematically overvalued Threlkeld's aluminum positions as well. Threlkeld claims that it promptly informed MG of this situation. On September 8, 1989, pursuant to MG's re-evaluation of Threlkeld's alu-

minum positions, MG issued an additional margin call to Threlkeld in the sum of 4.9 million dollars.

Threlkeld sued in the Vermont District Court, claiming losses of approximately fifteen million dollars as a direct result of the systematic overvaluation by MG. MG counterclaimed for Threlkeld's outstanding margin balance, approximately ten million dollars. MG then commenced an arbitration proceeding in London based on its margin demand and moved in the district court action to dismiss the complaint for lack of subject matter jurisdiction, or, in the alternative, to stay the proceedings and compel arbitration.

The district court, treating the motion as one for summary judgment, held that "for MG to prevail, it must demonstrate that no material issue of fact exists, and that the undisputed facts indicate [Threlkeld]'s claims are subject to arbitration." Judge Coffrin determined that material issues of fact existed as to whether Threlkeld's claims were arbitrable and thus denied the motion for summary judgment, as well as the alternative motion.

## DISCUSSION

■ As a point of departure, we note that federal policy strongly favors arbitration as an alternative dispute resolution process. *See Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 1919–20, 104 L.Ed.2d 526 (1989); *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987). While it is still the rule that parties may not be compelled to submit a commercial dispute to arbitration unless they have contracted to do so, *see Necchi S.p.A. v. Necchi Sewing Machine Sales Corp.,* 348 F.2d 693, 696 (2d Cir.1965), *cert. denied,* 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966), federal arbitration policy requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983).

■ The policy in favor of arbitration is even stronger in the context of international business transactions. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 629–31, 105 S.Ct. 3346, 3355–56, 87 L.Ed.2d 444 (1985); *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 516–518, 94 S.Ct. 2449, 2455–57, 41 L.Ed.2d 270 (1974). Enforcement of international arbitral agreements promotes the smooth flow of international transactions by removing the threats and uncertainty of time-consuming and expensive litigation. The parties may agree in advance as to how their disputes will be expeditiously and inexpensively resolved should their business relationship sour. *See Scherk,* 417 U.S. at 516–17, 94 S.Ct. at 2455–56. Stability in international trading was the engine behind the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, T.I.A.S. 6997, 330 U.N.T.S. 38, (Dec. 29, 1970) ("Convention") (implemented by the Federal Arbitration Act ("Arbitration Act"), 9 U.S.C. § 201 *et seq.* (1988)). This treaty—to which the United States is a signatory—makes it clear that the liberal federal arbitration policy "applies with special force in the field of international commerce." *Mitsubishi,* 473 U.S. at 631, 105 S.Ct. at 3356.

The district court lost sight of this presumption of arbitrability—probably because of the strange procedural posture the case assumed. The defendant, MG, having removed the action from the state court, moved to dismiss for lack of subject matter jurisdiction or, in the alternative, to compel arbitration. Inexplicably, the court on its own motion decided "to treat the motion at bar as one for summary judgment under Fed.R.Civ.P. 56." Having done that, the district court then applied generally accepted summary judgment standards, resolved all ambiguities in favor of the nonmoving party, and determined that issues of fact existed as to whether the asserted claims were arbitrable. The court thus refused to compel arbitration.

While we do not question traditional summary judgment standards, we believe that they are inapplicable to the present motion. The fatal flaw, since there was no

question that an agreement to arbitrate existed and that arbitration was refused, was the decision to convert a motion to compel arbitration under the Convention and the Arbitration Act into one for summary judgment. The district court erred in not deciding the motion simply as one to compel arbitration.

With this in mind, we turn now to the question of arbitrability. Our inquiry is two-fold: whether the parties agreed to arbitrate, and, if so, whether the scope of that agreement encompasses the asserted claims. *Fleck v. E.F. Hutton Group, Inc.,* 891 F.2d 1047, 1050 (2d Cir.1989); *Genesco,* 815 F.2d at 844; *see Mitsubishi,* 473 U.S. at 626–28, 105 S.Ct. at 3353–55.

## A. Agreement to Arbitrate

■ Threlkeld and MG agreed that their forward contracts for aluminum and copper would be subject to the LME Rules. As previously noted, the LME Rules contain two applicable arbitration provisions. Under accepted principles of contract law, a party is bound by an arbitration clause in a contract "unless he can show special circumstances that would relieve him of such an obligation." *Genesco,* 815 F.2d at 845. Threlkeld's first claim is that the arbitration provisions are unenforceable because the metals contracts which incorporate the LME arbitration provisions are contracts of adhesion.

For an arbitration provision to be stricken as a contract of adhesion there must be a showing of " 'unfairness, undue oppression, or unconscionability' " *Rush v. Oppenheimer & Co.,* 638 F.Supp. 872, 875 (S.D.N.Y.1986) (quoting *Finkle & Ross v. A.G. Becker Paribas, Inc.,* 622 F.Supp. 1505, 1512 (S.D.N.Y.1985)); *see Pierson v. Dean, Witter, Reynolds, Inc.,* 742 F.2d 334, 339 (7th Cir.1984) ("purpose of the unconscionability doctrine is to prevent unfair surprise and oppression"). Threlkeld's own admissions belie its claim that the present agreement represents a contract of adhesion. Threlkeld is a sophisticated commodities trader with extensive experience in this field. The LME arbitration provisions are typical of those employed in commercial contracts. Threlkeld cannot now claim that it did not understand its rights and obligations under the contracts. *See Genesco,* 815 F.2d at 846 (widespread use of arbitration clauses in the industry puts party on notice that contract contains one). We therefore find that these were not contracts of adhesion, and the LME arbitration provisions are enforceable.

■ In its next challenge to the arbitration agreement, Threlkeld asserts that Vermont law voids any arbitration agreement where there has not been a specific acknowledgment of arbitration signed by both parties. Vt.Stat.Ann. tit. 12, § 5652(b) (1989). This state statute requires that any agreement to arbitrate must be displayed prominently in the contract or contract confirmation and must be signed by the parties. Threlkeld asserts, and we agree, that the contracts in question do not comply with this rigorous standard. We conclude, however, that this state statute, if it applies at all, is preempted by federal law.

The international business transactions at issue are governed by federal arbitration law. The Supreme Court has clearly held that the Arbitration Act applies in federal court to diversity suits which relate to contracts involving interstate or international commerce. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402, 87 S.Ct. 1801, 1805, 18 L.Ed.2d 1270 (1967). The Arbitration Act applies to all "contract[s] evidencing a transaction involving commerce...." 9 U.S.C. § 2. Section 1 of the Arbitration Act defines "commerce" as interstate or international commerce. 9 U.S.C. § 1.

The metals contracts at issue as well as the alleged collateral agreement certainly involved international commerce. The metals contracts represented contracts for the purchase and sale of commodities futures in London, England by a Vermont-based corporation. The collateral valuation agreement was inextricably tied to these international trading contracts and must also be viewed as a contract "involving commerce" within the meaning of the Arbitration Act. *Prima Paint,* 388 U.S. at 401

& n. 7, 87 S.Ct. at 1804 & n. 7 (Arbitration Act's use of the term "commerce" not limited to interstate or international shipment of goods but applies also to contracts that directly affect interstate or international transportation of goods). We therefore hold that the Arbitration Act is applicable to the present dispute. This being the case, we narrow our focus to determine whether the Convention, as a specific unit of the Arbitration Act, is applicable, and, if so, whether it preempts the Vermont statute.

The Convention provides that:

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

21 U.S.T. 2517, Art. II(1). Furthermore, Section 202 of the Arbitration Act implements the Convention by providing:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention.

9 U.S.C. § 202. The goal of the Convention is to promote the enforcement of arbitral agreements in contracts involving international commerce so as to facilitate international business transactions on the whole. *Scherk*, 417 U.S. at 520 n. 15, 94 S.Ct. at 2457 n. 15. The United States, as a "Contracting State," has an obligation to enforce the Convention, and application of the Convention to the present international commercial dispute will achieve the goals of the Convention.

Because federal arbitration law governs this dispute, we must determine whether the Vermont statute is sufficiently consistent with federal law that the two may peacefully coexist. Article II, Section 1 of the Convention requires only that the agreement to arbitrate be in writing; this standard obviously is less rigid than that required by the Vermont statute. The Supreme Court has invalidated several state law provisions, on preemption grounds, where they impermissibly impinge upon the liberal federal arbitration policy. *See Perry v. Thomas*, 482 U.S. 483, 489–92, 107 S.Ct. 2520, 2525–27, 96 L.Ed.2d 426 (1987); *Southland Corp. v. Keating*, 465 U.S. 1, 11–16, 104 S.Ct. 852, 858–61, 79 L.Ed.2d 1 (1984). The First Circuit has recently held that restrictive provisions similar to those found in the Vermont statute are preempted by federal law. *See Securities Indus. Ass'n. v. Connolly*, 883 F.2d 1114 (1st Cir. 1989) (striking Massachusetts statutory scheme requiring *inter alia* that arbitration provision be "conspicuously disclose[d]"), *cert. denied,* ―― U.S. ――, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990).

We agree with the First Circuit that state statutes such as the Vermont statute directly clash with the Convention and with the Arbitration Act because they effectively reincarnate the former judicial hostility towards arbitration. Accordingly, we hold that the Convention and the Arbitration Act preempt the Vermont statute, and that the LME arbitration provisions, as drafted, are enforceable.

### B. *Scope of the Arbitration Agreements*

We focus next upon the scope of the arbitration clauses to determine whether Threlkeld's claims are arbitrable. Federal policy "requires us to construe arbitration clauses as broadly as possible." *S.A. Mineracao da Trindade–Samitri v. Utah International, Inc.*, 745 F.2d 190, 194 (2d Cir.1984). "[A]rbitration should be compelled 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *McAllister Bros., Inc. v. A & S Transportation Co.*, 621 F.2d 519, 522 (2nd Cir.1980) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 [1960]). Additionally, we are mindful of the Supreme Court's directive with respect to broad arbitration clauses:

"[I]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–85, 80 S.Ct. 1347, 1353–54, 4 L.Ed.2d 1409 (1960)).

As previously stated, the LME Rules contain two provisions regarding arbitration. The first requires arbitration of "any dispute ... arising out of any Contract." LME Rules, Part 4, Section 10.1. The term "Contract" is defined in the LME Rules as "a contract for metals in a form prescribed by and subject to the Rules of the [LME]." LME Rules, Part 1 ("Definitions and General Rules"). The second applicable arbitration clause requires arbitration of "[a]ll disputes arising out of or in relation to any contract which contains an agreement to refer disputes to arbitration in accordance with the Rules and Regulations of the London Metal Exchange...." LME Rules Part 8, Section 1.1.

Threlkeld argues that the second arbitration provision cannot apply here because the contracts in question do not specifically state that disputes will be referred to arbitration in accordance with LME Rules. Threlkeld asserts therefore that, if arbitration is required, it must perforce be under the first provision where arbitration is required for disputes "arising out of" contracts for metals. While this argument has a certain semantic appeal, it misses the point. These are not two individual, freestanding arbitration clauses; rather, they are interrelated in an integral fashion. Threlkeld would have us read each of these provisions in a vacuum. This we cannot do.

■ By incorporating the LME Rules into their contracts, the parties agreed to abide by all the Rules. Part 4 enumerates all the terms and conditions that are incorporated into a contract when that contract is made subject to the LME Rules. It is clear that once the parties agreed to abide by the Rules, Part 4, Section 10.1 became part of the contracts for metals. Thus, the contracts did contain an agreement to arbitrate in accordance with LME Rules, notwithstanding that the agreement did not appear on the face of the contracts. As such, Part 8, Section 1.1 is applicable. Part 8 provides for arbitration of all disputes "arising out of" or "in relation to" a particular contract. Reading these two provisions together, as we must, the core issue as to arbitrability is whether Threlkeld's claims arise out of or relate to the Threlkeld/MG contracts for metals.

Plainly, an agreement that requires arbitration of "all disputes arising out of or in relation to" a contract is broad enough to cover the disputes asserted in this case. *See Mitsubishi*, 473 U.S. at 624, n. 13, 105 S.Ct. at 3352, n. 13 (clause providing for arbitration of all disputes "which may arise between [parties] out of or in relation to" distribution and sales contract was broad enough to cover federal antitrust claims); *Fleck*, 891 F.2d at 1049–52 (clause providing for arbitration of "[a]ny controversy ... arising out of the employment or termination" of an employee broad enough to encompass post-termination torts which involve significant aspects of the prior employment); *Pervel Industries, Inc. v. TM Wallcovering, Inc.*, 871 F.2d 7, 8–9 (2d Cir.1989) (clause providing for arbitration of "any controversy 'relating to'" a purchase and sale contract broad enough to cover claims stemming from an alleged collateral agreement to provide plaintiff with an exclusive distributorship).

Threlkeld claims that its causes of action do not arise out of and do not relate to the underlying metals contracts. Rather, Threlkeld asserts that its claims arise out of a collateral agreement with MG, namely an agreement to value Threlkeld's forward contracts, and because the collateral agreement lacks an arbitration clause, the claims are not arbitrable. We cannot agree with this contention. The forward contracts were the genesis of the parties' relationship; the alleged collateral agreement stemmed directly from the forward con-

tracts. The metals contracts between Threlkeld and MG represent the subject matter of the alleged valuation agreements; absent the forward contracts, the valuation agreement "had no starting point, no finishing point and no subject matter." *Pervel*, 871 F.2d at 9.

In *Pervel*, the parties had a purchase and sale agreement for the defendant's fabrics and wallcovering products. A collateral agreement also allegedly existed where the plaintiff was to be given an exclusive distributorship license. Plaintiff sued for breach of the alleged collateral agreement. The original purchase and sale contract contained an arbitration clause which provided for arbitration of "any controversy 'relating to [the] contract.'" We affirmed the order compelling arbitration, holding that the alleged collateral agreement clearly related to the underlying purchase and sale contract. We saw "[t]he relationship between the contract of purchase and the exclusive distributorship which it created [as] clear and direct." *Id.* We believe the same clear and direct relationship between the forward contracts and the alleged collateral agreement exists in the present action. It should not pass unnoticed that Threlkeld's claims necessarily implicate the propriety of MG's margin call under the forward contracts at issue.

Threlkeld argues that its present valuation agreement, unlike the collateral agreement in *Pervel*, did not *necessarily* arise out of the underlying forward contracts because the valuation services could have been performed by any qualified member of the LME. This argument would have us ignore the fact that Threlkeld did not choose someone else to perform the valuation services. It chose MG. The alleged valuation agreement had as its subject matter the forward metals contracts; there is no meaningful distinction between the present situation and that faced by the *Pervel* court.

Threlkeld places great reliance upon *Necchi S.p.A. v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693 (2d Cir.1965), *cert. denied*, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966). Necchi S.p.A., a foreign manufacturer of sewing machines, had entered into an exclusive distributorship agreement with Necchi Sewing Machine Sales Corporation ("Sales Corporation") in 1961. The agreement provided for arbitration of "[a]ll matters, disputes or disagreements arising out of or in connection with" the agreement. The Sales Corporation sought to compel arbitration pursuant to the 1961 agreement of, *inter alia*, a dispute stemming from a separate 1958 agreement which required Necchi to assume the Sales Corporation's obligations under certain licensing arrangements between the Sales Corporation and a third party. We refused to order arbitration of the claims that arose out of the licensing agreement, concluding that the 1958 contract, which did not provide for arbitration, had "remained distinct and separate from the 1961 exclusive distributorship agreement containing the arbitration provision." *Id.* at 698.

Unlike the two contracts in *Necchi*, the metals contracts and the alleged valuation agreement in this case cannot be said to be "separate and distinct." Rather, they cover the same subject matter and are integrally related. *See Pervel Indus., Inc. v. TM Wallcovering, Inc.*, 675 F.Supp. 867, 869 (S.D.N.Y.1987) (*Necchi* distinguishable because district court unable to determine "with confidence" that the contracts at issue were "'separate and distinct'"), *aff'd*, 871 F.2d 7, 9 (2d Cir.1989) (district court "correctly distinguished" *Necchi*).

## CONCLUSION

Having resolved all doubts as to arbitrability in favor of arbitration, in accordance with federal policy, we find that the LME arbitration provisions are broad enough to cover the asserted disputes and we direct the parties to proceed to arbitration. On remand, the district court shall order the parties to arbitrate their grievances in ac-

cordance with the LME Rules.[2]

Reversed and Remanded.

---

**2.** There is some controversy as to whether dismissal of an action for lack of subject matter jurisdiction is required once a court orders arbitration pursuant to the Convention. *Compare Borden, Inc. v. Meiji Milk Products Co., Ltd.,* 919 F.2d 822, 826 (2d Cir.1990) (court ordering arbitration pursuant to the Convention retains subject matter jurisdiction to issue an injunction in aid of arbitration) *with McCreary Tire & Rubber Co. v. CEAT S.p.A.,* 501 F.2d 1032, 1038 (3d Cir.1974) (once arbitration is ordered pursuant to the Convention the court is stripped of subject matter jurisdiction over the action and dismissal is required) *and Astor Chocolate Corp. v. Mikroverk Ltd.,* 704 F.Supp. 30, 35 (E.D.N.Y. 1989) (same) *and Siderius, Inc. v. Compania de Acero del Pacifico, S.A.,* 453 F.Supp. 22, 25 (S.D. N.Y.1978) (same). We prefer not to reach this question unless and until it is properly raised before the district court on remand.