Petition for Writ of Mandamus Conditionally Granted; Appeal Dismissed
and Opinion filed January 5, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 



NO. 14-09-00202-CV



 

IN RE HELIX ENERGY
SOLUTIONS GROUP, INC.

____________________________________________________________________

 

ORIGINAL
PROCEEDING 

WRIT OF MANDAMUS

___________________________________________________________________

 

NO. 14-09-00107-CV

 

Helix Energy Solutions Group, Inc.,
Appellant

 

V.

 

Dyna Torque Technologies, inc. and Intec
Engineering, L.P. N/K/A Intecsea, Inc., Appellees



 



 

On
Appeal from the 334th District Court

Harris County,
Texas



Trial Court Cause
No. 2008-57972

 



 

OPINION

This is an interlocutory appeal (Cause Number
14-09-00107-CV) and petition for writ of mandamus (Cause Number
14-09-00202-CV).  Appellant/relator Helix Energy Solutions Group, Inc.
challenges the trial court’s order denying its motion to stay and compel arbitration
of claims brought by appellee/real party in interest Dyna Torque Technologies,
Inc. against Helix and appellee/real party in interest Intec Engineering, L.P.
n/k/a INTECSEA, Inc.  We consolidated these two proceedings.  See
In re Valero Energy Corp., 968 S.W.2d 916, 916-17 (Tex. 1998) (orig.
proceeding) (per curiam).  We conditionally grant the petition for writ of
mandamus and dismiss the interlocutory appeal as moot. 

Background

           
Helix is located in Houston and provides various marine-based services,
including construction and pipeline work, to the oil and gas industry. 
Helix BV is a division of Helix located in the Netherlands.  Dyna Torque
provides automated welding services for the pipeline construction industry and
is located in Houston.  INTECSEA provides project management services for
deep water pipeline and subsea production out of Houston.    

On November 8, 2006,
Helix BV requested a quote from Dyna Torque to provide special welding
equipment and services[1]
to outfit its pipe-laying vessel Caesar in connection with construction
of an offshore pipeline for Murphy Exploration & Production Company-USA
(“Murphy”) called the “Thunder Hawk” project.  Dyna Torque submitted its original
quote to Helix BV on November 15, 2006 for welding procedures development and
qualifications in the amount of $1,173,900.  The quote also stated:
“Payment terms: 50% of procedure price in advance; balance due after delivery
of qualified procedure; terms for production to be discussed, typically 15% of
the value of the contract due at signing of contract with equipment being
available 8-10 weeks after signing of the contract; remainder of the contract
value to be paid after system installation on board pipelay [sic] vessel.”

According to Dyna Torque, Helix BV offered continuous
assurances throughout late 2006 and early 2007 that the Caesar would be
equipped with Dyna Torque’s Lone Star Automated Welding System, and that a
purchase order requesting Dyna Torque’s services would be forthcoming. 
Dyna Torque employee Andrew Scherfenberg stated in his affidavit that Dyna
Torque received a portion of Murphy’s project specifications on March 29, 2007,
which required onshore and offshore administrative facilities. 

Dyna Torque employee Dejan Medanic stated in his
affidavit that Helix BV employee Hans van Maris told him at an April 2, 2007
meeting that Helix had selected Dyna Torque’s Lone Star Automated Welding
System to outfit the Caesar.  At that same meeting, van Maris asked
Dyna Torque to “start working on the design of the welding trolleys where
equipment will be installed.”  Medanic says he “immediately began working
on the design of the trolley for use on the Caesar.”  An April 5,
2007 e-mail reflects that Helix BV employee Rommel Heemskerk sent Dyna Torque
specifications for the design of a welding trolley for the Caesar. On
April 27, 2007, Heemskerk inquired by e-mail about the progress of the welding
trolley design.  Medanic replied on May 6, 2007, and asked Heemskerk for
further specifications.

Medanic further states in his affidavit that by late
May 2007 he was providing Helix with monthly progress reports on the design for
installing Dyna Torque equipment on the Caesar.  A May 30, 2007
e-mail entitled “CAESAR CONVERSION – MONTHLY ENGINEERING REPORTS FOR MAY –
REMINDER” from Heemskerk addressed to Medanic and other recipients states: “May
I remind you all of your Monthly report due for Friday coming (1st
June) 12:00hrs.  Make sure the narrative is accompanied with the usual
schedule and progress updates in PDF and native format.”

In May 2007, INTECSEA assigned its employee Ron Tomon
to serve as the project manager for the upcoming Thunder Hawk project pursuant
to an engineering and consulting services agreement INTECSEA and Helix signed
on April 27, 2007.  Tomon’s duties included “managing, on Helix’s behalf,
the subcontractors’ work, scheduling the work performed by the subcontractors,
as well as monitoring the quality and safety of the work performed by the
subcontractors . . . hiring subcontractors and terminating subcontractors . . .
.”  

In June 2007, Helix signed an agreement with Murphy
to install offshore export pipelines and flowlines for Murphy’s Thunder Hawk
project.

Between June 28, 2007 and July 10, 2007, Scherfenberg
and Medanic of Dyna Torque had three meetings with Tomon and Helix employee
Robert van der Kooij “regarding Murphy administrative facilities, procedures
development and consumables selection.”[2] 
According to Dyna Torque, Helix and Tomon stalled on issuing a purchase order;
Dyna Torque nonetheless “aided in the consumables selection process by
recommending various welding wire for consumables selection welding and testing
to determine if the same wire could be used for the Thunder Hawk” project and
other projects in which the Caesar was slated to participate.  In
early August 2007, Dyna Torque obtained tensile testing for welds used in
consumables selection and procedures development at the request of INTECSEA
project manager Tomon.

Dyna Torque’s Scherfenberg states in his affidavit
that he met with Tomon on August 8, 2007 “regarding payment terms, progress on
the work related to consumables selection and procedures development for the
projects.”  Scherfenberg also states that the minutes of the August
meeting reflect discussions “regarding approval of our [Dyna Torque’s] quote,
payment terms, progress on the work related to consumables selection and
procedures development for the projects.”  

On August 9, 2007, van der Kooij sent Scherfenberg an
e-mail in which he inquired about welding procedure qualifications for Helix’s
“Noonan” project — another project for which the Caesar was
slated.  Van der Kooij states in an e-mail as follows: “Question for you:
We need to qualify the procedures for this project.  When is the earliest
opportunity? We are thinking October? Can you please advise.  As soon as
I’m back in the [sic] Houston we have to sit together with our project manager
Douglas Gorman to go through the project.”

Scherfenberg further states in his affidavit that
Dyna Torque “ordered more than 1.2M in equipment prior to August 21, 2007 for
procedures development, welder qualification and training, double jointing, and
for eventual use on the Caesar and for projects to which the Caesar would
be slated.”

On August 21, 2007, Helix and Dyna Torque signed a
Master Service Agreement (the “MSA”) “for welding equipment, facilities and
services to be provided by Dyna Torque to Helix.” 

The Master Service Agreement controls and governs
“the performance of all work by . . . [Dyna Torque] for Helix and/or Helix’s
Customer, given on or after the date hereof.”  The Master Service
Agreement does not provide for the performance of any specific work for any specific
price.  Instead, it requires Helix to issue work orders to Dyna Torque;
upon Dyna Torque’s acceptance of the work orders, they become part of the
Master Service Agreement: 

III. WORK ORDERS TO BE PART OF THIS CONTRACT

This Contract does not obligate Helix to order works and/or
equipment or materials from . . . [Dyna Torque], nor does it obligate . . .
[Dyna Torque] to accept such orders, but it, together with any applicable work
order which shall form a part hereof, shall control and govern all work accepted
by . . . [Dyna Torque] and shall define the rights and obligations of Helix and
. . . [Dyna Torque], during the term hereof.  In the event of conflict, this
contract shall take precedence over any work order, delivery ticket or any
other document issued . . . .  (emphasis in original).

The Master Service Agreement
also includes an arbitration clause.  It provides as follows:

XIII. DISPUTES – ARBITRATION

Any dispute arising under this Contract that is not settled
by negotiation of the parties shall be settled in accordance with the
provisions of Helix’s Contract with its customer [Murphy] if the dispute
affects the customer.  In the absence of any such provisions and in cases
in which the customer is not affected, any such dispute shall be settled by
arbitration in accordance with the Construction Industry Arbitration Rules of
the American Arbitration Association before an arbitrator selected in
accordance with such rule.  It is the preference of the parties that all
such arbitration be conducted in Houston, Texas.[3]

Dyna Torque contends there
was an internal disagreement between Helix and Helix BV by October 2007
regarding the selection of Dyna Torque as the welding contractor, which “forced
those against Dyna Torque to use any means necessary to force Dyna Torque to
breach the contract.”  According to Dyna Torque, “Tomon attempted to
rewrite history by ignoring the turnkey quote and informing Dyna Torque that he
will ‘pick and choose’ items on Dyna Torque’s quotation for approval. 
After reminding Mr. Tomon that Helix BV requested a turnkey, not a line item
quote, Dyna Torque received a PO [Purchase Order] on October 17, 2007.”

           
Helix employee Roy Sijthoff states in his affidavit that “Pursuant to Section
III of the MSA, Helix issued Purchase Order 135392 (the “PO”) to Dyna Torque
for welding equipment to be installed on Helix’s offshore services vessel, the Caesar. 
. . .  The PO also covered facilities and services to develop and test
welding procedures and supplies, and training of Helix’s personnel on the
welding procedures.”  This purchase order in the amount of $1,009,350 was
dated October 17, 2007 and stated, “ALL ITEMS PER DYNA TORQUE QUOTE NO.
111506-A-3 DATED 09/04/07.”[4]


On October 30, 2007, Dyna Torque issued invoice
number 1553 in the amount of $442,825.00.  This amount represented a “50%
Down Payment for PO# 135392, Job# 714823/Murphy – Balance of $885,250 after
Credit of $124,100.00 DE Charges Quoted Total Amount PO# 135392
$1,009,350.00.”  Dyna Torque also issued invoice number 1567 in the amount
of $125,144.00 on October 30, 2007 for  

Consumables
Selection: Days July 20, 21, 23, 24; Aug. 8; Sept. 7, 8, 9 Prepare Weld Nos. 1
through 8 (at the request of Robert van der Kooij)

Day Rate:
Automatic Welding Equipment

Day Rate:
Warehouse Facility Use

Laboratory
and Testing Charges for consumable selection Welds 1 through 8

Training
and Equipment Familiarization: Oct. 16 through Oct. 30

Helix
Welders: Training and Equipment Familiarization

Day Rate:
Automatic Welding Equipment

Day Rate:
Warehouse Facility Use

Pipe Facing
/ Beveling Machine Services for Helix Welder Training: 10/15/07 – 10/19/07

Pipe Facing
/ Beveling Machine Services for Helix Welder Training: 10/22/07 – 10/26/07

Monthly
Office Rental Charge – Pre-Contract for Sept.-Oct. 2007

 

According to Dyna Torque,
Tomon sent Dyna Torque an e-mail on November 6, 2007 in which he stated that
“‘he can not agree to pay 50% of the PO value up front for any contractor or
services’ [which is] in direct contradiction to statements he made on August 8,
2007 and the PO that was issued October 17, 2007.”  Tomon states in his
affidavit that, after he spoke with Roy Sijthoff of Helix concerning Dyna
Torque’s lack of performance under the Master Service Agreement and with
Sijthoff’s consent, he “communicated Helix’s termination of the Master Service
Agreement to Dyna Torque in November of 2007.”

           
Dyna Torque contends that Tomon called Scherfenberg on November 14, 2007 “to
advise that Helix was pulling out and that Dyna Torque was to cease any further
work . . . .  Of course, this is in direct contradiction to Dyna Torque’s
contract with Helix and was an overt attempt to have Dyna Torque breach by
non-performance under the contract.”  On November 18, 2007, Dyna Torque
issued invoice number 1617 for $15,657.50.  The invoice contained charges
for the following:

WEEK OF
10/26/07 – 11/02/07 

Warehouse
Charges for consumable selection program by Robert and Helix Welders, allocated
area and resources made available as required

Equipment
Rental – TIG Unit (Equipment not rented in Murphy scope)

Beveling /
Flame Cut charges per end

Dyna Torque
Warehouse men helpers as required

WEEK OF
11/05/07 – 11/09/07

Warehouse
Charges for consumable selection program by Robert and Helix Welders, allocated
area and resources made available as required

Equipment
Rental – TIG Unit (Equipment not rented in Murphy scope)

Beveling /
Flame Cut charges per end

Dyna Torque
Warehouse men helpers as required

WEEK OF
11/12/07 – 11/16/07

Warehouse
Charges for consumable selection program by Robert and Helix Welders, allocated
area and resources made available as required

Equipment
Rental – TIG Unit (Equipment not rented in Murphy scope)

Beveling /
Flame Cut charges per end

Dyna Torque
Warehouse men helpers as required

 

Dyna Torque contends that
Tomon drafted a termination e-mail letter on November 19, 2007 even though
Helix was “still not in compliance with the Master Service Contract.” Sijthoff
states in his affidavit that “Helix and Dyna Torque were involved in a dispute
over materials Dyna Torque held in possession that were owned by Helix or
Murphy in connection with the Project.  On January 4, 2008, Helix and Dyna
Torque signed a letter agreement under which Helix made a payment on the
account to Dyna Torque under the PO in the amount of $100,000.”  The
January 4, 2008 agreement states in pertinent part as follows:

Payment on the Account and Return of all Materials

As confirmed in your phone conversation with Ron Tomon on
January 2, pursuant to Purchase Order # 135392 (the “Purchase Order”) under the
Master Service Contract (the “Contract”) . . . between Helix . . . and Dyna
Torque . . . attached please find a check (the “Check”) in the amount of ONE
HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00) made payable to Dyna
Torque.

By execution hereof, Dyna Torque acknowledges and agrees
that 

1.      It has received
this letter and the Check

2.      The Check constitutes
payment on the account under the Purchase Order and the Contract . . .

                                   
*                                 
*                                 
*          

In order that Helix may make any payments which may be due
and owing to Dyna Torque under the Contract, as we have previously instructed,
please deliver invoices for all outstanding amounts which Dyna Torque believes
it is owed, accompanied by proper supporting documentation for such amounts as
required by the Contract.  Any such amounts will be partially offset by
the amount represented by the Check.

Execution of this letter by Dyna Torque shall not
constitute a waiver of claims for amounts which Dyna Torque believes it is owed
under the Contract but which are not covered by the Purchase Order.

On January 4, 2008, Dyna
Torque issued invoice number 596 for $839,545.90.   Although the
invoice contained charges for preparatory costs incurred by Dyna Torque, most
of the charges were for services rendered and items supplied by Dyna Torque
pursuant to Purchase Order No. 135392 dated October 17, 2007.  Sijthoff
states in his affidavit that Helix notified Dyna Torque’s counsel on February
1, 2008 that any dispute over payment of the invoices falls within the scope of
the Master Service Agreement’s arbitration provision, and that Dyna Torque’s
claims must be resolved by arbitration.

           
On October 1, 2008, Dyna Torque filed suit against Helix and INTECSEA asserting
numerous claims.  

First, Dyna Torque asserted a claim on a sworn
account alleging that Helix and INTECSEA owed Dyna Torque $1,232,862.30 based
on invoices numbered 1553, 1567, 1617, and 596 issued to Helix.  Dyna
Torque alleged that it sold Helix and INTECSEA goods and services at their
request; that the prices charged were “provided according to the terms of the
MSA and PO and/or, in the alternative, the usual customary and reasonable
prices;” that Helix and INTECSEA accepted the goods and services; and “became
bound to pay Dyna Torque its designated charges.”

           
Second, Dyna Torque asserted a claim for breach of contract.  Dyna Torque
alleged that it provided various quotes for goods and services; that Helix and
INTECSEA accepted Dyna Torque’s terms “for providing goods and services and for
additional goods and services in addition to those originally quoted as well as
those specifically listed under the quotes;” and that Helix and INTECSEA became
bound to pay upon acceptance.  

Third, Dyna Torque asserted an alternative claim for
promissory estoppel against Helix and INTECSEA, claiming that “[e]ven if there
lacks a promise to pay for certain goods and services provided by Dyna Torque .
. . [Helix and INTECSEA] are still liable to Dyna Torque for those goods and
services as they were required to meet scheduling demands implied for providing
goods and services requested by” Helix and INTECSEA.

           
Fourth, Dyna Torque asserted a claim for breach of the duty of good faith and
fair dealing.  Dyna Torque alleged that the “unique nature of the multiple
stage contract imposed a duty of good faith and fair dealing” on Helix and
INTECSEA; that Helix and INTECSEA breached that duty “by undermining Dyna
Torque’s ability to perform under the contract;” and that Helix and INTECSEA
are liable for breaching their duty of good faith and fair dealing.

           
Fifth, Dyna Torque asserted a claim for breach of a “duty to cooperate.” 
It alleges that “[c]ooperation was essential for successful performance under
the verbal requests for goods and services, the MSA and PO;” that Helix and
INTECSEA had a duty not to interfere with Dyna Torque’s performance; and that
Helix and INTECSEA breached that duty “by interfering with Dyna Torque’s
ability to perform under the contract.”

           
Sixth, Dyna Torque asserted a claim for fraud, alleging that Helix and INTECSEA
made false representations “with the intent that Dyna Torque should act upon it
[sic] by entering into the MSA and ordering, manufacturing and delivering
equipment and materials, performing work listed and requested after the RFQ[[5]]
and affecting significant modifications to Dyna Torque’s premises;” that Dyna
Torque “acted in reliance on the representations by entering into the MSA,
ordering equipment and materials, performing work listed and requested after
the original quote;” and that Dyna Torque suffered financial loss.

           
Seventh, Dyna Torque asserted a claim for tortious interference with contract,
alleging that Dyna Torque had a valid contract with Helix BV, Helix and/or
INTECSEA to provide equipment and services for consumables qualification and
procedures development “through the MSA, PO, or requests for services;” that
Helix BV, Helix and/or INTECSEA interfered with “one or more of these
contracts;” and that this interference proximately caused Dyna Torque damages.
 Lastly, Dyna Torque requested attorney’s fees and expenses pursuant to
chapter 38 of the Texas Civil Practice and Remedies Code.

           
On October 31, 2008, Helix filed a motion to stay and compel arbitration under
the Federal Arbitration Act and the Texas Arbitration Act.  On November
25, 2008, INTECSEA filed a motion for partial summary judgment.  On
December 12, 2008, Helix filed a supplemental brief in support of its motion to
stay and compel arbitration.  

INTECSEA filed its objection to Helix’s motion to
stay and compel arbitration on December 18, 2008, arguing that it cannot be
compelled to arbitrate because it was not a signatory to “the underlying Master
Service Agreement or the arbitration clause contained therein.”  INTECSEA
alternatively asked the trial court to stay proceedings between Dyna Torque and
INTECSEA until the arbitration between Dyna Torque and Helix is concluded.[6]

           
Dyna Torque also filed its objection to Helix’s motion to stay and compel
arbitration on December 18, 2008.  Dyna Torque contended that Helix failed
to establish that the claims asserted by Dyna Torque are within the arbitration
agreement’s scope because Helix did not satisfy the conditions precedent to
triggering arbitration.  According to Dyna Torque, as a condition
precedent to arbitration Helix had to establish that Dyna Torque’s claims
affected Helix’s customer Murphy.  Dyna Torque also contended that its
claims are not subject to arbitration because “the work was given prior to the
parties entering into the MSA.”  

           
The trial court signed an order on December 29, 2008, denying Helix’s motion to
stay and compel arbitration concluding “that movant has not satisfied its
burden.”

Analysis

           
Helix contends that the trial court abused its discretion by denying its
motion to stay and compel arbitration as to Dyna Torque. 

A.       
Governing Law

As it did in the trial court, Helix contends here
that the Federal Arbitration Act (“FAA”) and the Texas Arbitration Act (“TAA”)
apply in this case.  Dyna Torque contends that the FAA applies in this
case because (1) the choice of law provision in the Master Service Agreement
states that the contract shall be governed by maritime law; and (2) “the
contract is a maritime transaction as contemplated by the FAA.”  The
arbitration clause at issue does not specifically invoke either the FAA or the
TAA, and the trial court did not determine which statute applies.  As a
threshold matter, therefore, we first determine which statute governs this
case.

           
The TAA and FAA provide alternative vehicles for relief.  In re Educ.
Mgmt. Corp., 14 S.W.3d 418, 425 (Tex. App.—Houston [14th Dist.] 2000, orig.
proceeding).  A trial court’s order denying a motion to compel arbitration
may be reviewed by interlocutory appeal when the motion is brought under the
TAA.  Tex. Civ. Prac. & Rem. Code Ann. § 171.098(a)(1) (Vernon
2005).  When the order at issue was signed, mandamus was the appropriate
vehicle to challenge an order denying arbitration under the FAA.[7] 
In re Bank One, N.A., 216 S.W.3d 825, 826 (Tex. 2007) (orig. proceeding)
(per curiam); EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 91 (Tex. 1996)
(per curiam).  

           
The FAA governs a written arbitration clause in any contract involving commerce
or evidencing a maritime transaction.  See 9 U.S.C.A. § 2 (West
2009).  “Maritime transaction” means any agreement “relating to . . .
supplies furnished vessels.”  Id. § 1 (West 2009).  The Master
Service Agreement in this case evidences a maritime transaction because it
relates to supplies and services Dyna Torque was to provide to furnish Helix’s Caesar
vessel.  Accordingly, the FAA governs the Master Service Agreement and the
issue of whether the arbitration clause contained therein applies to Dyna
Torque’s asserted claims.

           
 If the arbitration clause is enforceable under the FAA, an analysis of
enforceability under the TAA is unnecessary.  See In re D.
Wilson Constr. Co., 196 S.W.3d 774, 783-84 (Tex. 2006); In re Anaheim
Angels Baseball Club, Inc., 993 S.W.2d 875, 877 n.1 (Tex. App.—El Paso
1999, orig. proceeding [mand. denied]).  Accordingly, we first review the
petition for writ of mandamus to assess enforceability of the arbitration
provision under the FAA.

B.        Standard
of Review 

Mandamus is proper to correct a clear abuse of discretion
when there is no adequate remedy by appeal, as when a party is erroneously
denied its contracted-for arbitration right under the FAA.  In re D.
Wilson Constr. Co., 196 S.W.3d at 780.  A trial court abuses its
discretion if it acts in an arbitrary or unreasonable manner without reference
to any guiding rules or principles.  In re Nitla S.A. de C.V., 92
S.W.3d 419, 422 (Tex. 2002) (orig. proceeding) (per curiam).  “A trial
court ‘has no discretion in determining what the law is or applying the law to
the facts.’”  In re D. Wilson Constr. Co., 196 S.W.3d at 780
(quoting Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992) (orig.
proceeding)).

The party seeking to compel arbitration under the FAA
must establish that (1) a valid arbitration agreement exists; and (2) the
claims at issue fall within that agreement’s scope.  In re Dillard
Dep’t Stores, Inc., 186 S.W.3d 514, 515 (Tex. 2006) (orig. proceeding) (per
curiam).  “Generally under the FAA, state law governs whether a litigant
agreed to arbitrate, and federal law governs the scope of an arbitration
clause.”  In re Weekley Homes, L.P., 180 S.W.3d 127, 130 (Tex.
2005) (orig. proceeding).  Because federal policy strongly favors
arbitration, a presumption exists favoring agreements to arbitrate under the FAA,
and any doubts about the agreement’s scope are resolved in favor of
arbitration.  In re FirstMerit Bank, N.A., 52 S.W.3d 749, 753 (Tex.
2001) (orig. proceeding). 

Arbitration clauses are enforced under the FAA
“unless it can be said with positive assurance that the clause is not
susceptible of an interpretation that covers the dispute at issue.”  United
Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574,
582-83 (1960); see also Prudential Sec. Inc. v. Marshall, 909 S.W.2d
896, 899 (Tex. 1995).  If the movant establishes the existence of a valid
arbitration agreement governing the dispute at issue, the burden then shifts to
the opposing party to present evidence of a defense to enforcing the
agreement.  J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 227
(Tex. 2003).  Absent a defense to enforcing the arbitration agreement, the
trial court has no discretion but to compel arbitration and stay its own
proceedings.  In re J.D. Edwards World Solutions Co., 87 S.W.3d
546, 549 (Tex. 2002) (per curiam).

C.       
Existence and Scope of the Arbitration Agreement

The parties do not dispute the existence of a valid
arbitration clause in the Master Service Agreement signed by Helix and Dyna
Torque.  Their dispute centers around whether the claims Dyna Torque
asserted against Helix fall within the scope of the Master Service Agreement’s
arbitration clause.  The arbitration clause provides that any dispute
“arising under” the Master Service Agreement that is not settled by Dyna Torque
and Helix must be settled under Helix’s contract with its customer Murphy if
the dispute affects Murphy.  If the dispute does not affect Murphy, it
must be arbitrated.

Helix argues that Dyna Torque’s claims fall within
the clause’s scope based on (1) the facts and claims Dyna Torque alleged in its
petition; and (2) evidence proffered below to establish that Helix’s customer
Murphy was not affected by the dispute between Dyna Torque and Helix. 
Dyna Torque contends that its claims fall outside the clause’s scope because (1)
Dyna Torque did not assert claims for work “given” by Helix after August 21,
2007, the date on which Helix and Dyna Torque signed the Master Service
Agreement; and (2) Helix failed to establish that Helix’s customer Murphy was
not affected by the dispute between Dyna Torque and Helix.  

Determining whether a claim falls within an
arbitration agreement’s scope is a matter of contract interpretation and, thus,
a question of law for the court.  AT & T Technologies, Inc. v.
Commc’ns Workers of Am., 475 U.S. 643, 649 (1986).  We focus on the
complaint’s factual allegations, rather than the legal causes of action
asserted.  Prudential Sec., 909 S.W.2d at 900; In re
Autotainment Partners Ltd. P’ship, 183 S.W.3d 532, 536 (Tex. App.—Houston
[14th Dist.] 2006, orig. proceeding).  

We consider whether the facts alleged are “factually
intertwined” with the contract containing the arbitration clause, Jack B.
Anglin Co. v. Tipps, 842 S.W.2d 266, 271 (Tex. 1992); “inextricably
enmeshed” with the contract, Griffin v. Semperit of Am., Inc., 414
F.Supp. 1384, 1389 (S.D. Tex. 1976); or have a “significant relationship” to
the contract, Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.,
96 F.3d 88, 93 (4th Cir. 1996).  We also consider whether the facts
alleged “touch matters” covered by the contract.  Genesco, Inc. v. T.
Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987).

1.        
Was Helix’s Customer Murphy Affected by the Dispute Between Helix and Dyna
Torque?

 

We first address Helix’s contention that Dyna
Torque’s claims fall within the scope of the Master Service Agreement’s
arbitration clause because Helix established that its customer, Murphy, was not
affected by the present dispute.  

The arbitration clause provides that any dispute
arising under the Master Service Agreement “that is not settled by negotiation
of the parties shall be settled in accordance with the provisions of Helix’s
Contract with its customer [Murphy] if the dispute affects the customer. 
In the absence of any such provisions and in cases in which the customer is not
affected, any such dispute shall be settled by arbitration.” 

In his affidavit, Helix employee Sijthoff stated that
“[n]otwithstanding Helix’s dispute with Dyna Torque, Helix has been able to provide
its customer, Murphy, the welding services for the Project by obtaining such
services from another contractor.  Thus, the present dispute between Dyna
Torque and Helix does not affect Murphy.”  Dyna Torque did not object to
the form or substance of this statement in Sijthoff’s affidavit.

           
Dyna Torque contends that (1) Sijthoff’s affidavit “fails to refute that the
dispute affects Murphy[;]” and (2) Scherfenberg and Medanic’s affidavits
establish that Murphy was affected by the dispute between Dyna Torque and
Helix.  In particular, Dyna Torque points to the following statements in
Medanic’s affidavit:

The Caesar was slated for the upcoming Murphy
Thunder Hawk, Helix’ Danny and Noonan, and the BP Skarv projects.  Because
Dyna Torque has the expertise in the use of its automated welding system, each
project to which the Caesar would be scheduled would have to have Dyna
Torque as the welding contractor.  For instance, Dyna Torque would have to
develop welding procedures for each specific pipe lay during the project. 
During that process, the Helix welders working on the Caesar would be
trained on the procedures for eventual qualification to work on each portion of
the project.

Dyna Torque also highlights
this statement in Scherfenberg’s affidavit: “Because the use of the equipment
and technology are essential elements of qualifying the welding procedures and
because the same procedures must be used during production, the projects to
which the Caesar had been slated must use Dyna Torque’s equipment and
technology.”

           
Dyna Torque misplaces its reliance on these statements by Scherfenberg and
Medanic because they do not support Dyna Torque’s assertion that Murphy was
affected by the present dispute between Dyna Torque and Helix.  The highlighted
statements merely assume Dyna Torque’s continued participation in the Thunder
Hawk project.  These statements do not controvert Sijthoff’s affidavit, in
which he expressly states that the present dispute did not affect Murphy. 
Accordingly, we conclude that Helix established its customer was not affected
by the Helix — Dyna Torque dispute.

2.        
Do Dyna Torque’s Claims “Arise Under” the Master Service Agreement?

 

We next address Helix’s contention that Dyna Torque’s
claims “arise under” the Master Service Agreement and therefore are subject to
the Master Service Agreement’s arbitration clause.

The Master Service Agreement provides that it
controls and governs “the performance of all work by . . . [Dyna Torque] for
Helix and/or Helix’s Customer, given on or after [August 21, 2007].”
(emphasis added).  The Master Service Agreement does not provide for the
performance of any specific work for any specific price. It requires Helix to
issue work orders to Dyna Torque and, upon Dyna Torque’s acceptance, the work
orders become part of the Master Service Agreement: “This Contract . . .
together with any applicable work order which shall form a part hereof, shall
control and govern all work accepted by . . . [Dyna Torque] and shall define
the rights and obligations of Helix and . . . [Dyna Torque], during the term
hereof.  As noted above, the Master Service Agreement’s arbitration clause
provides that “[a]ny dispute arising under this Contract that is not settled by
negotiation of the parties . . . shall be settled by arbitration.”

Helix argues that the substance of Dyna Torque’s
pleadings and the evidence presented to the trial court establish that Dyna
Torque’s claims arise under the Master Service Agreement because (1) in its
petition, Dyna Torque “repeatedly alleges that Dyna Torque was expecting a
purchase order from Helix for the [Murphy] Project, and that Helix finally
issued the purchase order on October 17, 2007” pursuant to section III of the
Master Service Agreement; (2) Dyna Torque invoiced Helix for goods and services
“based on a PO that is part of the MSA[,]” and asserted claims for damages
“that are explicitly based upon Helix’s failure to pay those invoices[;]” and
(3) the Master Service Agreement “is the only agreement that could support Dyna
Torque’s claims” because it contains a broad merger clause that would have
absorbed any other agreements between the parties.

Dyna Torque counters that its claims against Helix do
not arise under the Master Service Agreement because all of the work upon which
Dyna Torque predicates its claims was given by Helix to Dyna Torque before the
parties signed the Master Service Agreement on August 21, 2007.  Dyna
Torque contends that “none of the work forming the basis of this suit was for
work subsequent to or pursuant to a written work order.”  Dyna Torque
contends more specifically that “all of the claims and damages sought in this
matter arise from work given . . . to Dyna Torque prior to August 21,
2007.  . . . Dyna Torque has not claimed that any amounts due to it arise
out of the MSA because none of the work about which this matter arose were
[sic] given to Dyna Torque on or after the effective date of the MSA.” 

Dyna Torque’s appellate assertions are belied by the
claims and factual allegations contained in Dyna Torque’s pleadings. 
Further, the record before the court does not support Dyna Torque’s contention
that all of Dyna Torque’s work was completed before the parties signed the
Master Service Agreement.  

a.                 
Dyna Torque predicated most of its claims on the Master Service
Agreement and the purchase order Helix issued after the parties signed the
Master Service Agreement

 

In its petition, Dyna Torque asserted claims for
breach of contract, promissory estoppel, breach of duty of good faith and fair
dealing, a breach of duty to cooperate, fraud, tortious interference with a
contract, and a claim on a sworn account.  Dyna Torque expressly invoked
the Master Service Agreement and Purchase Order 135392 in its petition on a
majority of its asserted claims. Further, Dyna Torque based its sworn account
claim specifically on four invoices Dyna Torque issued after the parties signed
the Master Service Agreement and Helix issued Purchase Order 135392.  Dyna
Torque alleged that Helix failed to pay for goods and services provided by Dyna
Torque and prayed for actual damages in an amount equal to the four
invoices.  In particular, Dyna Torque alleged as follows in its petition: 

·        With regard to its
claim on a sworn account, Dyna Torque alleged that it sold Helix and INTECSEA
goods and services at their request; that the prices charged were “provided
according to the terms of the MSA and PO and/or, in the alternative, the usual
customary and reasonable prices;” that Helix and INTECSEA accepted the goods
and services; and “became bound to pay Dyna Torque its designated
charges.”            

·        With regard to its
claim for breach of a “duty to cooperate,” Dyna Torque alleged that
“Cooperation was essential for successful performance under the verbal requests
for goods and services, the MSA and PO;” that Helix and INTECSEA had a duty not
to interfere with Dyna Torque’s performance; and that Helix and INTECSEA
breached that duty “by interfering with Dyna Torque’s ability to perform under
the contract.”  Dyna Torque asserted a claim for fraud, alleging that
Helix and INTECSEA made false representations “with the intent that Dyna Torque
should act upon it [sic] by entering into the MSA and ordering, manufacturing
and delivering equipment and materials, performing work listed and requested
after the RFQ and affecting significant modifications to Dyna Torque’s
premises;” that Dyna Torque “acted in reliance on the representations by
entering into the MSA, ordering equipment and materials, performing work listed
and requested after the original quote;” and that Dyna Torque suffered
financial loss.

·        Regarding its claim for
tortious interference with a contract, Dyna Torque alleged it had a valid
contract with Helix BV, Helix and/or INTECSEA to provide equipment and services
for consumables qualification and procedures development “through the MSA, PO,
or requests for services;” that Helix BV, Helix and/or INTECSEA interfered with
“one or more of these contracts;” and that this interference proximately caused
Dyna Torque damages.  

As evidenced by Dyna Torque’s petition, Dyna Torque’s
claims are predicated in significant degree on the Master Service Agreement and
Purchase Order 135392 issued pursuant to the Master Service Agreement. 
Having expressly sued on the Master Service Agreement, Dyna Torque is
hard-pressed to argue now that its claims do not “arise under” the Master
Service Agreement.  

b.                 
Purchase Order 135392 confirms that Dyna Torque was “given” work after
the Master Service Agreement was signed 

 

Dyna Torque’s petition and the evidence presented
below indicate that Dyna Torque (1) expected Helix to issue a purchase order
approving and accepting Dyna Torque’s formal quote; and (2) was “given” work
when Helix issued Purchase Order 135392 on October 17, 2007 — after the parties
signed the Master Service Agreement on August 21, 2007.  Dyna Torque had
been asking Helix to issue Purchase Order 135392 since 2006.  Purchase
Order 135392 was the formal document by which Dyna Torque was given work under
the Master Service Agreement.

The parties’ dispute “arises under” the Master
Service Agreement because it focuses in significant part on Purchase Order
135392 issued pursuant to the Master Service Agreement.  Work performed
under Purchase Order 135392 and for which Dyna Torque sued Helix is captured by
the Master Service Agreement’s arbitration clause.  This conclusion is
supported by the following excerpts from Dyna Torque’s factual allegations and
the evidence presented in the trial court:

·        Dyna Torque submitted a
formal quote to Helix in November 2006; according to Medanic’s affidavit, Dyna
Torque was told in April 2007 that Helix had selected Dyna Torque as its
welding system contractor on Helix’s upcoming Thunder Hawk project for Murphy.

·        Notwithstanding this
notification, Dyna Torque expected a formal acceptance of its submitted quote
through a formal purchase order from Helix.  Dyna Torque alleged in its
petition: “Throughout late 2006 and early 2007, Helix BV continued to provide
assurances that the Caesar would be equipped with LAWS and that a
Purchase Order (hereinafter “PO”) requesting services would be forthcoming.”

·        Dyna Torque also
alleged in its petition that Helix BV visited Dyna Torque’s facilities in late
April 2007 “and, again, assured Dyna Torque personnel that Dyna Torque would
equip the Caesar . . . .  Based on these assurances along with
assurances that the PO and Initial Payment would be forthcoming, Dyna Torque
began preparations to qualify procedures and participated in preparatory
project meetings . . . with various Helix BV, Helix Houston, and Intec
personnel during May of 2007.”  

·        Dyna Torque alleged
that its “requests for the Initial Payment and issuance of the Purchase Order
approving the terms of the Original Quote as well as the additional work
requested . . . met with increasing hostility.”  In August 2007, Tomon
again assured “Scherfenberg that Dyna Torque would receive the Purchase Order
and Initial Payment for procedures development and qualifications
services.”  

·        Dyna Torque alleged in
its petition that “By mid to late October, . . . Tomon attempted to rewrite
history by ignoring the turnkey quote and informing Dyna Torque that he will
‘pick and choose’ items on Dyna Torque’s quotation for approval.  After
reminding Mr. Tomon that Helix BV requested a turnkey, not a line item quote,
Dyna Torque received a PO [135392] on October 17, 2007.”

·        Helix employee
Sijthoff’s affidavit stated that “[p]ursuant to Section III of the MSA, Helix
issued Purchase Order 135392” to Dyna Torque; this purchase order “also covered
facilities and services to develop and test welding procedures and supplies,
and training to Helix’s personnel on welding procedures.”

·        In its petition, Dyna
Torque alleged that Helix failed to make an Initial Payment as required by
Purchase Order 135392, which was based on Dyna Torque’s quote and required a 50
percent payment in advance upon acceptance of the quote and issuance of the
Purchase Order. [8]  Thus, Dyna Torque expected Helix to
make a 50 percent upfront payment for the goods and services requested, i.e.
the work given, via Purchase Order 135392.

·        When Helix did not make
the Initial Payment allegedly required by Purchase Order 135392, Dyna Torque
issued two invoices on October 30, 2007.  Invoice # 1553 asked Helix to
make a “50% Down Payment for PO#135392” in the amount of $442,625. 
Invoice # 1567 contained charges for work and services provided by Dyna Torque
between July 20, 2007 and October 26, 2007 in the amount of $125,144. These
invoices establish that Dyna Torque did not complete all work before the
parties entered into the Master Service Agreement or before Helix issued
Purchase Order 135392. 

·        In its petition, Dyna
Torque alleged that Tomon stated in a November 6, 2007 e-mail that “he ‘can not
agree to pay 50% of the PO value up front for any contractor or services’ in
direct contradiction to statements he made on August 8, 2007 and the PO that
was issued October 17, 2007.” 

·        According to Dyna
Torque’s petition, Tomon advised Dyna Torque “that Helix was pulling out” and
instructed Dyna Torque “to cease any further work . . . in direct contradiction
to Dyna Torque’s contract with Helix[;]” Dyna Torque issued invoice #1617 on
November 18, 2007 for services and equipment provided between October 26, 2007
and November 16, 2007.  

·        In its petition, Dyna
Torque alleged that on November 19, 2007, Tomon drafted “a termination e-mail
letter.  Of course, it [Helix] is still not in compliance with the Master
Service Contract.”

·        Additionally, the
record contains the parties’ January 4, 2008 settlement letter, which
specifically links Purchase Order 135392 to the Master Service Agreement. 
The letter states: 

Payment on the Account and Return of all Materials

As confirmed in your phone conversation with Ron
Tomon on January 2, pursuant to Purchase Order # 135392 (the “Purchase Order”)
under the Master Service Contract (the “Contract”) . . . between Helix . . .
and Dyna Torque . . . attached please find a check (the “Check”) in the amount
of ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00) made payable to Dyna
Torque

By execution hereof, Dyna Torque acknowledges and
agrees that 

1.  It has
received this letter and the Check

2.  The Check constitutes payment on the account
under the   Purchase Order and the Contract . . .

        
*                             
   *                            
  *       

In order that Helix may make any payments which may
be due and owing to Dyna Torque under the Contract, as we have previously
instructed, please deliver invoices for all outstanding amounts which Dyna
Torque believes it is owed, accompanied by proper supporting documentation for
such amounts as required by the Contract.  Any such amounts will be
partially offset by the amount represented by the Check.

Execution of this letter by Dyna Torque shall not
constitute a waiver of claims for amounts which Dyna Torque believes it is owed
under the Contract but which are not covered by the Purchase Order.

·        As instructed in the
settlement letter, Dyna Torque issued invoice # 596 for $839,545.90 on January
4, 2008.  Most of the charges contained on the invoice were for services
rendered and items supplied by Dyna Torque pursuant to Purchase Order 135392,
with some additional charges for preparatory costs. 

·        Invoices #1553 and #
596 were issued by Dyna Torque pursuant to Purchase Order 135392 and
specifically reference Purchase Order 135392.  November invoice # 1617 was
issued by Dyna Torque for work and services it provided between October 26,
2007 and November 16, 2007 — after the Master Service Agreement was signed and
Purchase Order 135392 was issued.  

Based on the record before us, we reject Dyna
Torque’s contention that “[s]ince Dyna Torque’s claims arise out of goods and
services given before Dyna Torque and Helix entered into the MSA, the
MSA and, consequently, its arbitration clause does not apply in this
matter.”  Dyna Torque’s contention that all work forming the basis of the
present dispute was given before the signing of the Master Service Agreement
and Helix’s issuance of Purchase Order 135392 pursuant to the Master Service
Agreement fails in light of the factual allegations and evidence discussed
above.  

If all work had indeed been “given” on April 2, 2007
(the date Helix orally told Dyna Torque it selected Dyna Torque’s welding
system to outfit the Caesar for its upcoming Murphy project), or any
time before the Master Service Agreement was signed, then Dyna Torque would
have had no reason to rely on Helix’s assurances that a purchase order
“requesting services would be forthcoming” or “imminent.”  There would
have been no need for the parties to sign the Master Service Agreement; no need
for Helix to issue Purchase Order 135392 pursuant to the Master Service
Agreement requesting work based on Dyna Torque’s quote; and no need for Dyna
Torque to issue invoices specifically referencing Purchase Order 135392. 
Dyna Torque’s repeated allegation that it awaited the issuance of Helix’s
purchase order for months underscores that the parties envisioned a formal
purchase order to be the vehicle by which work would be given to Dyna Torque by
Helix.  

Based on the factual allegations and the evidence, we
conclude that work was “given” to Dyna Torque when Helix issued Purchase Order
135392 pursuant to the Master Service Agreement.  Claims based on work
“given” after the parties signed the Master Service Agreement are subject to
the Master Service Agreement’s arbitration clause.  

The factual allegations and evidence also suggest
that Helix gave Dyna Torque some portion of work before the parties signed the
Master Service Agreement when Helix asked Dyna Torque to “start working on the
design of the welding trolleys where equipment will be installed;” obtain
tensile testing; provide “monthly progress reports on the design for
implementing [Dyna Torque’s] equipment onto the Caesar[;]” and
perform consumable selection welds.  Thus, Dyna Torque’s suit encompasses
claims for work requested and provided before the parties signed the Master
Service Agreement in addition to work given after the Master Service Agreement
was signed.  Arbitration nonetheless is mandated because on this record
these claims are “factually intertwined” with the arbitrable claims.  See
Prudential Sec. Inc., 909 S.W.2d at 900 (determining that FAA  applied
to the case); Jack B. Anglin Co., 842 S.W.2d at 271 (same).  For
the foregoing reasons, we hold that Dyna Torque’s asserted claims are
subject to arbitration, and that the trial court abused its discretion in
denying Helix’s motion to compel arbitration of Dyna Torque’s claims against
Helix.

D.        Stay
of Litigation Pending Arbitration

Helix requests that all proceedings in the trial
court be stayed until the arbitration of Dyna Torque’s claims against Helix is
concluded.  Helix argues that, once it “established that Dyna Torque’s
claims were subject to a valid agreement to arbitrate, the trial court had no
discretion but to stay its proceedings . . . .  This mandatory stay must
include not only the claims against Helix, but also the claims against Helix’s
co-defendant, INTECSEA, because the claims against INTECSEA involve overlapping
claims and issues.”  INTECSEA does not oppose staying the proceedings in
the trial court.  Federal law requires courts to stay litigation of claims
that are subject to arbitration until arbitration is completed.  9
U.S.C.A. § 3 (West 2009); In re Merrill Lynch Trust Co. FSB, 235 S.W.3d
185, 195-96 (Tex. 2007) (orig. proceeding).  Even when a party has brought
arbitrable claims against one party and claims not subject to arbitration
against another party in the same lawsuit, courts should stay all
litigation.  See In re Merrill Lynch Trust Co. FSB, 235 S.W.3d
195-96.  

Accordingly, we conclude that the trial court abused
its discretion in failing to stay Dyna Torque’s litigation against Helix and
INTECSEA until arbitration of Dyna Torque’s claims against Helix is concluded. 

Conclusion

           
We hold the trial court abused its discretion in denying Helix’s motion to
stay the litigation and compel arbitration of Dyna Torque’s claims against
Helix.  We therefore conditionally grant mandamus relief under the FAA
without addressing the merits of the interlocutory appeal pursuant to the TAA;
we dismiss that appeal as moot.  We direct the trial court to vacate its
order denying Helix’s motion to stay the litigation and compel arbitration of
Dyna Torque’s claims against Helix, and enter a new order in accordance with
this opinion.  The writ will issue only if the trial court fails to act in
accordance with this opinion.

                                                                                   


                                                                       
/s/        William J. Boyce

                                                                                   
Justice

 

 

Panel
consists of Justice Boyce and Senior Justice Mirabal.[9]  Former Justice Guzman not
participating.

 














[1]
More specifically, Helix BV asked Dyna Torque to provide a quote for project
management and engineering, welding procedure qualifications, welder
qualifications, mobilization and demobilization of personnel and equipment,
dayrate for equipment, provision of consumables, provision of spares for
equipment, and dayrate for personnel.





[2] The minutes of the June 28, 2007 meeting reflect the
following “Record of Discussions”: “DT [Dyna Torque] to provide Client [Murphy]
office on site with normal office amenities.”  The July 6, 2007 meeting
minutes reflect the following “Record of Discussions”: “DT [Dyna Torque]
confirmed that they will be setting up some kind of temporary offices and
conference room for Murphy employees.”

 





[3]
The Master Service Agreement does not delineate the terms of any dispute
resolution “provisions of Helix’s Contract with” Murphy.  Dyna Torque does
not contend that any “provisions” of the June 2007 Helix - Murphy contract
should apply to the Dyna Torque – Helix dispute in place of the Master Service
Agreement’s arbitration clause.  





[4]
The record before this court does not contain Dyna Torque’s Quote No.
111506-A-3 dated 09/04/07 referred to in the October 17, 2007 purchase
order.  The record contains only Dyna Torque Quote No. 111506-A and No.
111506-B dated November 15, 2006.





[5]
“RFQ” apparently stands for “Request For Quote.”





[6] This opinion addresses only the arbitrability of Dyna
Torque’s claims asserted against Helix; it does not address the arbitrability
of Dyna Torque’s claims against INTECSEA. In the trial court, Helix requested
that Dyna Torque’s claims against INTECSEA also be sent to arbitration;
however, Helix has abandoned its request in this court.

 





[7]
Section 51.016 of the Civil Practice and Remedies Code was amended effective
September 1, 2009 to allow an interlocutory appeal of an order denying a motion
to compel arbitration under the FAA.  See Tex. Civ. Prac. &
Rem. Code Ann. § 51.016 (Vernon Supp. 2009).  Section 51.016 does not
apply here because the order at issue was signed on December 29, 2008.





[8]
Dyna Torque alleged that the original quote and each subsequent revision of the
quote “specifically stated in paragraph 5 of the Note section: ‘Payment terms:
50% of procedure price in advance; balance due after delivery of qualified
procedure’ (hereinafter ‘Initial Payment’).”





[9]
Senior Justice Margaret Garner Mirabal sitting by assignment.